# CHARLESTON.

JENNINGS v. SOUTHERN CARBON CO. *et al.*

Submitted November 6, 1917.   Decided November 13, 1917.

MINES AND MINERALS—*Protection From Drainage of Minerals—Fraud
and Collusion—Evidence.*

   In the former opinion herein, 73 W. Va. 215, were stated the
   principles governing the rights asserted by the bill, charging
   fraudulent and collusive failure adequately to test and develop
   plaintiff's lands for oil and gas and to protect them from drain-
   age of such minerals through wells operated on other lands.   Upon
   this appeal, the evidence adduced upon the final hearing is con-
   sidered and found insufficient to support the allegations of the
   bill.

Appeal from Circuit Court, Doddridge County.

Suit by Virginia Jennings against the Southern Carbon
Company and others.   Decree for plaintiff, and defendants
appeal.

*Reversed, and bill dismissed.*

*Brannon, Stathers & Stathers, W. B. Gribble, Chas. Powell*
and *Kemble White,* for appellants.

*A. F. McCue* and *Smith D. Turner,* for appellee.

LYNCH, PRESIDENT:

The decree dismissing, upon demurrer, the bill, charging fraud, conspiracy and drainage, was reversed on a former appeal, the opinion being reported in 73 W. Va. 215. The answers since filed specifically deny these charges and other material facts alleged against the respondents, and assert utmost good faith in dealing with the leasehold oil and gas rights on the lands of plaintiff and of other owners in the same locality. The question for decision now is whether upon the issues raised the proof is, as the lower court found it to be, sufficient to entitle plaintiff to the relief prayed and granted.

In 1901 Southern Carbon Company, a corporation, entered the territory comprising the lands of plaintiff and other owners of tracts contiguous to or adjoining hers or which adjoin other lands touching hers, and at various times prior to the institution of this suit in January, 1910, and upon an expenditure of more than $40,000, drilled wells for oil and gas, among which was one on the extreme eastern edge of the Jennings land. The wells on the several tracts are designated and identified on the map filed, by the name of the landowner and by number in the order in which the wells were drilled.

In so far as they are material upon the question of drainage, many of these wells may be eliminated entirely from this discussion. They are located at such distances from the nearest boundary line of the Jennings tract that no drainage through such wells could have occurred. They are the Melissa Davis No. 1, 4400 feet distant; Longacre 1, 1996 feet; Longacre 3, about 1200 feet further away; Longacre 4, a dry hole; Shannon 1, 2227 feet; Shannon 2, 1782 feet; Cheuvront 1, 1179 feet; Cheuvront 2, 1962 feet; Maxwell 3, 1400 feet; and Mobley, about 1000 feet distant. These wells, producing only small quantities of oil or gas, could not have injuriously affected the value of the mineral estates in the Jennings land, because of their remoteness therefrom, whatever their productiveness may have been, and no witness expressed the opinion that they did so affect her land.

Maxwell 1 and 2, located 577 and 759 feet respectively

from the Jennings boundary, in each of which gas was found in paying quantities, clearly were off-set and more than off-set by Jennings No. 1, a large gas well, because it was drilled within a few feet of the line common to both tracts. One witness says in his opinion that well drew more gas from the Maxwell tract than the two Maxwell wells did from the Jennings tract.

Gribble 1, located 61 feet from the Jennings boundary; Gribble 2, very near thereto; Carroll lot 1, 150 feet, Stewart 1, 594 feet, and Carroll heirs 1, 478 feet, may possibly have affected the oil and gas rights of plaintiff, but to what extent the proof fails to show, even approximately.

Gribble 1 produced, when completed in August, 1906, from ten to fifteen barrels of oil per day, and not to exceed a million feet of gas, according to the highest estimate. No attempt was made to market the gas from it, which was used to force the flow of oil to the surface, and for domestic purposes by tenants on the Gribble farm. John M. Gribble, the owner, says the well produced some oil and very little gas, neither in sufficient quantity to give it any marketable value; and from a tabulation filed with his amended answer it appears the total oil produced by the well from September 14, 1906, to January 1, 1910, was 3401.76 barrels, or an average daily production of 2.82 barrels during that period. What the production of Gribble 2 was we have no data from which to determine. Hence, it may be assumed the well was valueless.

Carroll lot well No. 1 was completed in May, 1906. J. E. Trainer, who drilled it, says the production was "supposed to be Gordon oil and a little bit of gas, not to amount to anything"; he does not know whether "it ever paid out". Just what oil it produced is indicated only by feet measurements covering long intervals and ranging from one foot and nine inches to nearly seven feet in the storage tank. What that amounted to is not estimated, and no method is furnished to ascertain it.

Stewart 1, when completed in 1905, produced, as one witness guesses, 30 barrels of oil daily, another says 20 barrels; but the quantity had diminished to two barrels when the depositions were taken.

Carroll heirs No. 1, completed in August, 1907, produced then about four million cubic feet of gas daily, and about 135,000 feet January 1, 1915, with an open flow pressure of about fifteen pounds.   This well witnesses say was smaller than Jennings 1, as in fact the proof shows; that Jennings 1 was a very good off-set to it.   From the location of these two wells, and regarding the production from each of them, it is more than probable this statement is correct; because the relative locations of the two wells with reference to the property line and to each other likely would effect that result; that is, each would neutralize the other as to drainage, or the Jennings well would draw from the Carroll tract in at least the same proportion as Carroll heirs 1 would draw from the Jennings land.

While what has been said indicated with reasonable certainty that none of the wells whose history has been given has by drainage materially affected the mineral estates in the Jennings tract, that they did so affect such rights and estates but one witness, and he a tool dresser and later and now the operator of a pool room, ventured to say.   If there was any such drainage, it was not, when taken into consideration with other facts proved, sufficient to warrant the decree appealed from.   But if the quantity was materially injurious and detrimental, equity is not the forum to grant compensation, where that relief is the sole object of the suit.   So that, unless the bill presents other equities, it can not be sustained.

The decree avowedly rests mainly upon the character of the oil and gas producing sands, the Big Injun and Gordon, in that immediate territory, as determined by the wells.   The court seems to have found their character and quality such as to warrant the tests to which the Jennings tract was not put by developments thereon.   The proof as to which there is no contradiction shows the sands to be erratic, hard in some tracts and parts of tracts, open and porous in others, broken and lacking consistency in still others.   In many places the sands were shallow, and only three feet thick.   Where hard, broken or thin, the drill failed to discover oil or gas, or but little of either, and most of the wells had no durability, and barely if at all compensated the operator in an amount ex-

ceeding expenditures for drilling and operation. While of course this condition and result do not foreclose the inquiry, they are to be considered, and to them weight attached, upon the question of fraud and lack of diligence. But the proof also eliminates the charge of actual fraud. None is shown. No witness competent to speak, indeed none except two, testify to any fraudulent conduct further than to say other wells should have been drilled on the Jennings tract; one or two, one of them says; the other answered, "why to fully develop the farm it would require more drilling I would think." Neither of these witnesses possessed knowledge or experience in the business, except such as they had acquired in subordinate employment in drilling for these minerals or in other like inferior service. Nor had they or either of them engaged in active operations on his own account, or made investments therein, and hence had not the qualifications generally deemed sufficient to determine what number of wells or whether any additional wells should have been drilled. To require operations of such magnitude, cost, danger and risk, the proof must be clear and strong, and express the opinion of men competent to judge. This court has said the number and location of wells requisite to the performance of a covenant to drill depend upon the character of the leased territory, *Hall* v. *Oil Co.*, 71 W. Va. 82; and "whether, after the discovery of oil or gas by means of the initial or experimental well, there is a duty to sink additional wells depends upon the probability arising from the circumstances surrounding the property that an additional well or wells will be profitable to the lessee. He is under no duty to operate at a loss to himself to make the premises profitable to his lessor". The lessee must bear all the burdens incident to developments. If the well is dry he loses its cost. If it proves rich in either mineral, the lessor receives his share, but loses nothing in any event. Which of them then should control prosecution of the necessary operations? The former opinion herein, *Grass* v. *Development Co.*, 75 W. Va. 719, *Steele* v. *Development Co.*, 92 S. E. 410, and other cases, say the operator, except where he fraudulently fails or refuses to act when affirmative action is required. He can not unduly delay operations where

clearly the conditions surrounding the property are such as require speedy progress to effect development and to afford protection against drainage. These principles are not new; they have frequently been enunciated, so frequently that further citations seem unnecessary.

It can not justly be said that, because lacking in good faith, the Southern Carbon Company has sinned against the rule granting to the lessee the right to determine the time and extent in and to which leased lands should be developed. Many competent witnesses say the company has done what in their opinion, based on experience in similar circumstances, was sufficient to test the land fully; and no witness qualified to speak says otherwise. These qualifications are defined in the cases cited *supra, Brewster* v. *Zinc Co.,* 140 Fed. 814; *State* v. *Musgrave,* 43 W. Va. 673; 3 Jones on Evidence, §359. As some·of these and other cases say the proof of such dereliction must be clear, positive and substantial. There is not need to allude to the conspiracy charge. No foundation exists therefor in the evidence. Some of the alleged collusive parties actually were rival operators until Gribble obtained the oil rights in the Jennings land through the Southern Carbon Company. Moreover, Mrs. Jennings forbade Gribble to enter on her lands to drill after he acquired title to the oil rights therein. This admonition he could observe or disregard as he chose, but he elected to obey. She can not therefore justly complain because he respected her wishes.

For the reasons assigned, we are of opinion to reverse the decree and dismiss the cause.

*Reversed, and bill dismissed.*