**HUMBLE OIL & REFINING CO. v. STRAUSS et al. (No. 1989.)**

(Court of Civil Appeals of Texas. Amarillo. June 21, 1922.)

**1. Evidence ⬅419(8)—Not permissible to show oral contract different from written contract under guise of proving consideration.**

Under the guise of showing consideration of a written contract of assignment of an oil lease, an oral agreement to commence development at once, making a contract different from the writing and the lease, with the terms of which the assignee agreed to comply, may not be shown.

**2. Mines and minerals ⬅78(1)—Express agreement in lease as to time to commence drilling well excludes implied contract to commence at once.**

Relative to contention that evidence of a parol agreement of assignee of an oil lease to commence drilling at once did not add any more to his written contract than did a covenant which was implied, express agreement in the lease, giving six months to commence operations, that lessee should commence drilling with diligence if a well producing a certain amount per day for a certain period be drilled on adjoining property within a certain distance of the leased property, excluded any implied contract, otherwise arising under the circumstances, that lessee should commence drilling at once in anticipation of drainage of the flush production.

**3. Appeal and error ⬅1040(10), 1053(5)—Error in overruling exceptions to pleading and evidence of oral agreement different from writing prejudicial.**

Error in overruling exceptions, in an action against assignee of two oil leases for delay in commencing and prosecuting drilling of wells, to the petition alleging, and the testimony showing, an oral agreement to commence drilling at once, whereas the leases allowed six months, cannot be said to have been harmless, though the issues submitted confined the jury to damages occasioned after drilling commenced, especially where the issues submitted did not take cognizance of there being two leases, and of the operations on the two tracts commencing at different times.

**4. Evidence ⬅529—Effect of oil well on surrounding land proper question for expert.**

Whether drilling oil wells thickly around a given area will draw oil from surrounding land is a proper question for expert knowledge and opinion.

**5. Evidence ⬅546—Qualification of expert largely in trial court's discretion.**

Ordinarily, qualification of an expert is largely in the discretion of the trial court.

**6. Mines and minerals ⬅86—Legislature can authorize rules for conserving oil.**

The Legislature has power to authorize rules for conserving and preventing waste of oil in the land.

**7. Evidence ⬅553(1)—Hypothetical question should be framed on the facts for expert.**

Usually to take the opinion of an expert a hypothetical question should be framed on the facts, and the trial court should see that the opinion is not based on improper facts or on an unimportant hypothesis, or one not supported by the facts, especially where witness is not a scientific man, but one whose knowledge has been acquired by practical observation.

**8. Mines and minerals ⬅78(1)—Obligation of lessee after operations began to save from waste by outside wells implied.**

The provision of oil lease, giving six months to commence operations, that lessee should commence drilling with diligence if even before such time a well producing a certain amount per day for 30 days be drilled on adjoining property within 200 feet of the leased property, does not control the question of drainage after operations begin, but thereafter there is an implied obligation on lessee to act to save from waste on the leased premises caused by any outside well, whatever be its distance or capacity.

**9. Trial ⬅352(5)—Special issue held not to combine two issues.**

Special issue whether assignee of oil lease sank as many wells as reasonable diligence required under all the circumstances to extract the oil from under the premises, and to protect said property from drainage by wells on adjacent premises, *held* not to submit two issues in one; as, if as many wells were put down as diligence required, under the circumstances, to extract the oil, this would protect

---

the premises from drainage by wells on adjacent premises.

**10. Trial ☞358—Contradictory answers on special issues leave no finding.**

Contradictory answers on two special issues, in effect the same, leave no finding.

**11. Trial ☞255(3)—Request for charge on burden of proof on special issues submitted necessary.**

To complain of charge not being given on the burden of proof on special issues submitted, request should be made therefor.

**12. Trial ☞215—General charges properly refused in a case submitted on special issues.**

Requested charges in a case submitted on special issues are properly refused, they being in effect general charges, and not explanations as to the issues submitted, as required by statute.

**13. Mines and minerals ☞74—Assignor of oil lease held to have cause of action against assignee for loss from noncompliance with lease.**

The contract of assignment of oil leases requiring the assignee to drill and comply with the terms of the lease, it failing so to comply, breached the contract, giving the assignor a cause of action for loss therefrom, if the contract did not create a partnership, with consequent lessening of duty.

**14. Appeal and error ☞930(3)—Finding to support judgment may be imputed to trial court.**

There being no finding by the jury on an issue, one may be imputed to the trial court thereon if necessary to support the judgment.

**15. Mines and minerals ☞97—Partnership not necessarily created by assignment of oil leases because of right of assignor to share in proceeds of oil.**

An assignment of oil leases, placing in the assignee the title with the right of possession and alone to work the property, does not necessarily create a partnership because of provision for assignor sharing in proceeds of oil produced.

**16. Partnership ☞17—Question largely of intention.**

Whether an arrangement creates a partnership is, as between the parties to it, largely one of intention.

**17. Corporations ☞379—Generally cannot enter partnership.**

As a general rule a corporation cannot enter into partnership relations, though sometimes after it has executed such a contract courts will sustain the relation to prevent injustice.

**18. Evidence ☞73—No presumption of intention to make ultra vires contract.**

There is no presumption that parties intended to make an ultra vires contract, but, on the contrary the presumption is of knowledge of limitation of power and of the law, and intention to obey the law.

Appeal from District Court, Wichita County; E. W. Napier, Judge.

Action by J. O. Strauss and others against the Humble Oil & Refining Company. Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

E. E. Townes, John C. Townes, Jr., and G. P. Dougherty, all of Houston, and Fitzgerald & Hatchitt, of Wichita Falls, for appellant.

Weldon, McDonald & Cummings, Carrigan, Montgomery, Britain, Morgan & King, and Bullington, Boone, Humphrey & Hoffman, all of Wichita Falls, for appellees.

HUFF, C. J. This suit was instituted by appellees against appellant for damage occasioned by the failure to use diligence to produce and save oil from under 9.4 acres of land, and in permitting the oil to be drained therefrom by operators on contiguous land or in the surrounding oil fields, and delay in drilling wells or a sufficient number, and for the abandonment of production of oil from the land and the wells put down. The action is predicated upon two lease contracts and a contract between appellant and appellees and an assignment of two leases to appellant by appellee. July 27, 1918, N. C. Parsons and wife leased to J. H. Hill 4½ acres of land, giving to him the right of drilling and operating thereon for oil, gas, and other minerals, and the right to lay pipes, etc., to operate any wells that the lessee may bore, and to make merchantable the products therefrom, to have and to hold to the lessee, his successors and assigns, for the term and under the provisions as follows: The exclusive right to make as many attempts if and as the lessee may desire to find oil or gas in paying quantities. The lessee may begin operations within 6 months from date. The lessee has the right of extension for successive periods of 6 months by paying the lessor $50, and, if within 12 months or during any extension period the lessee shall have begun operations in an attempt to find oil, he may do so without making further payments. The lessee may continue with reasonable diligence such attempt as long as he shall wish to do so; also providing for cessation of prospective work and for payment of rents after cessation, the extension periods not to be prolonged beyond 2 years, and, if operations be not begun before the expiration of that period, lease to wholly terminate, with some other provisions relative to work begun before the termination of that period. If during the period oil or gas in paying quantities is found, the lessee has the right to mine and produce so long as any one of the minerals can be produced in paying quantities. The lessee was to pay and deliver to the lessor, free of charge and cost to him, one-eighth of the oil saved. The sixth provision reads:

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"If even prior to any discovery of oil on said leased premises and while this agreement shall be in force, there shall be drilled on adjacent property and within two hundred (200) feet of any line of said leased premises a well producing as much as two hundred (200) barrels of oil per day for thirty (30) consecutive days, lessee agrees that lessee will with all reasonable diligence begin and prosecute the drilling of a well on said leased premises in a faithful effort to find and produce oil in paying quantities."

It is provided if the estate of either party is assigned the covenants therein should extend to the assignees and successive assigns; that all conditions and terms should extend to the heirs, etc., and assigns of the parties. The lessee paid $1,000 to the lessor, which was received in full satisfaction of each and every right granted thereby.

On July 27, 1918, Mrs. M. C. Phillips leased to J. H. Hill 4.9 acres. The provision of this latter lease is the same as the one from Parsons, above set out. July 30, 1918, Hill assigned the two above leases to J. C. Strauss and J. L. Art, for the consideration of $5,000. T. C. Scruggs, one of the appellees herein, was equally interested with Strauss and Art in the assignment, and joins in this action as one of the plaintiffs. August 1, 1918, Strauss and Art, for themselves, and also for Scruggs entered into a contract with appellant. The contract reads:

"That for and in consideration of the sum of $5,000.00 cash in hand paid by the party of the second part [the appellant], the parties of the first part [the appellees] have this day assigned to the said party of the second part two certain oil and mineral leases on land situation in Wichita county, Texas [describing the land], and for the further consideration of the agreement hereinafter named the said party of the second part agrees to comply with the terms of said leases and to drill on said blocks of land as in said leases required. If the first well so drilled proves to be dry and nonproductive of oil, then the cost of such well shall be borne by said party of the second part, without any cost or expense whatsoever to said parties of the first part. Should said well, however, prove to be productive of oil in paying quantities, then the entire cost of such well shall be retained by the party of the second part out of the net proceeds of the oil produced and sold from said leases, and, after the cost of such well is fully paid to said party of the second part, then the proceeds of the oil thereafter produced on said leases, or either of them, shall be equally divided between said parties of the first part and said party of the second part. In case said first well shall prove dry and party of the second part shall desire to drill further well or wells on said leases the said first parties agree to pay one-half of the cost of such further drilling, or, failing to do so, shall forfeit all rights to said leases. In case said first well produces oil in paying quantities then the cost of all further drilling and development shall be borne one-half by first parties and one-half by second parties."

The assignment of the two leases by appellees to appellant is dated July 31, 1918, and recites a consideration of $1 and other good and valuable considerations, transferring the two leases and all their right, title, and interest therein, describing the leases and the land, and containing the following clause:

"And we do hereby grant, bargain, sell and convey unto the said Humble Oil & Refining Company all our right, title and interest in and to said land, together with all rights which we own or are entitled to as lessees in the leases above described. Said grantees herein take said leases subject to the terms and conditions thereof."

The contract and assignments are alleged and shown in fact to have been executed contemporaneously and as one transaction. The appellees, in their petition, plead the execution of the several contracts substantially as above set out, and allege that, as a main consideration and inducement to appellees for the assignment of the leases at the time of the execution of the above contract and assignment, the appellant fraudulently represented, if appellees were to assign the leases to it, that it would diligently and in good faith develop said leases for the production of oil, and would develop said leases to the full extent, as it had the equipment, means, and ability to do so; that it stood ready and willing to thoroughly and diligently develop the leases for oil and operate the same and take proper care of the production; that appellees relied upon said representations that it would at once develop the leased premises with diligence to the fullest extent and properly protect said leased premises, and so executed the assignments and contract. In virtue of such representations, which were the main consideration for the contract and assignment that it would fully carry out the provisions of the original lease, and by virtue of the written contract and assignments, the appellant "became bound and promised to at once develop said leased premises in good faith and diligence for oil and gas and not only develop the same but to diligently operate the same and carry out the terms of the original leases expressed and implied."

It is also alleged that between August 1, 1918, and September 1, 1918, a great number of wells were begun to be drilled throughout the town of Burkburnett and the surrounding territory, and hundreds of derricks were erected therein for the purpose of drilling for oil; that the discovery well about the 27th of July, 1918, was on the northeast side of Burkburnett, and the leased premises were on the southwest side of the town, not within the corporate limits; that it became apparent through the month of August that wells would be drilled all over the town and

in the surrounding territory on tracts which consisted of small tracts of land, and that on lots three wells would be and were drilled on such lots and four wells at least drilled to the acre, and that, unless parties should at once drill oil wells on their land, the flush production of oil from the pool known as the Burkburnett pool would be exhausted within six months, and, unless oil wells upon the leased premises were drilled with dispatch and diligence, oil underlying the premises would have flush production of oil taken therefrom by operators on adjoining tracts; the Phillips tract of land was immediately adjoining the Parsons tract of land; that many tracts being drilled were small tracts, consisting of not more than 50 by 100 feet, and surrounding the two tracts, all of which was known to appellant but that it failed and refused to begin drilling prior to the 27th of September, 1918, when it began drilling a well on the Phillips tract, which it did not complete until December, 15, 1918; that the well could have been drilled within 15 to 35 days; that the failure to complete the well so begun was the result of negligence and carelessness on the part of appellant; that it was not drilled with due care, and that it should have been completed by November 1st; that on account of the comparative large acreage in the leases it became the duty of appellant, in the exercise of ordinary care, to drill and complete at least six wells upon the two tracts within 6 months from August 1, 1918, in order to protect said leased premises from drainage; that it did not begin drilling its second well until October 21, 1918, and did not complete it until December 18, 1918, and did not begin its third well on the Phillips tract until February 1, 1919, and complete it until April 12, 1919; the fourth well upon the Phillips tract was not commenced until March 10, 1919, and not completed until April 17, 1919, and that appellant did not drill well No. 1 on the Parsons tract until December 12, 1918, and did not complete it until January 27, 1919, and did not begin drilling No. 2 on the Parsons tract until February 12, 1919, and did not complete it until March 22, 1919; appellant did not drill any more wells upon the premises; that the flush production in and around the premises had been exhausted under the premises at the time appellant commenced Nos. 3 and 4 on the Phillips tract and No. 2 on the Parsons tract, and the failure to complete the six wells was due to negligence and want of ordinary care; that appellant fraudulently failed and refused to drill said wells prior to February 1, 1919, and thereby appellant failed to get three-fourths of the flush production under the leased premises; appellants operated the leases until the 15th day of October, 1919, and abandoned the same and only produced about 52,000 barrels of oil; if appellant had used ordinary care and diligence in drilling said six wells after August 1, 1918, 6 months would have been a reasonable time, and by the 1st day of April, 1918, appellant should have thoroughly developed the property, and protected it from drainage, and had the appellant have completed at least twelve wells thereon, it would have produced to the present time 400,000 barrels of oil, and that the market price thereof would have been $3 per barrel, or a total of $1,200,000.

It is also alleged by appellees that the agreement between them and the appellant for the operation of said leases hereinabove set forth required the appellant to comply with the terms of said original lease, which was an express covenant upon the part of the appellant with the appellees, and there was an implied covenant in said transfer and assignment and in said original lease that appellant would use such diligence to drill as prudence would dictate, and drill them with dispatch, care, and caution, and operate the same after they were drilled, and that appellant was obligated expressly and impliedly by said contract and by said lease and by said assignment to exercise care and diligence in developing and operating said premises; that it was provided in said contract that, should the first well drilled prove to be productive of oil in paying quantities, then the entire cost should be retained by the appellant out of the proceeds of the oil produced and sold from said leases, and, after the cost was fully paid to appellant, then the proceeds from oil thereafter produced from said leases should be equally divided between appellees and appellant; that it was provided, in case the first well drilled should produce oil in paying quantities, then the cost of all further development should be borne one-half by the appellees and one-half by appellant; that the first well drilled did produce oil in paying quantities, and that all of the rest of the six wells produced oil in paying quantities, and that the reasonable cost of drilling and operating said premises and producing the amount of oil which should have been produced from said premises would not have exceeded 50 cents per barrel, and that appellants could have produced from said premises by the exercise of ordinary care and diligence 400,000 barrels of oil from the time of the assignment of said leases to the date of the filing of said amended petition, at a cost of not exceeding $200,000, and that, under the terms of said leases, appellees were entitled to one-eighth of the oil produced from the premises, free to them, and the owners of said lease would have been entitled to 50,000 barrels of the oil, and that, if appellants had used reasonable care and diligence in the development and operation of said premises, same should have produced net to appellees and appellant at least $400,000 each, and that, by reason of

appellant's negligence in the development of said property within a reasonable time, and by reason of the fact that it failed to fully and properly develop said premises and properly and diligently operate same, appellees have been damaged in the sum of $400,-000. They further allege appellant, without their knowledge and consent, during October, 1919, removed its equipment from the Phillips lease, and undertook to remove same from the Parsons lease, and fraudulently abandoned same; that after said fraudulent abandonment Parsons, the owner of one of the leases, in the summer of 1920, leased the same to other parties, and took over the two wells on the Parsons tract, and that said wells, after said abandonment, and at the time of filing of the petition, were producing from 1,200 to 1,500 barrels of oil per month, of the reasonable value of $3.50 per barrel, and were in fact producing over four barrels of oil per day, which is production in paying quantities; that said leases were fraudulently abandoned, and that appellant failed to exercise care and diligence in abandoning said wells, and that, if said wells had been properly operated, they could and would have produced from October, 1919, the date of the abandonment, to the time of filing the amended petition, 60,000 barrels of oil, of the value of $3 per barrel, and that the cost of operation of said leases during said time would not have exceeded $20,000; there would have been a profit in the operation of said leases to appellant and appellees from the time of abandonment of said lease, if the wells had been properly operated and diligently cared for, of at least 60,000. They allege, under the terms of the assignment to appellant, appellant had an exclusive power to operate said leases, and that appellees had no right to operate same, and that appellant negligently and fraudulently failed to properly develop same and prevent drainage of oil therefrom, and abandoned same, and that at that time these appellees had a right to one-half of the net production produced from said premises, and at the date of the abandonment were of the reasonable value of $200,000, which they lost by reason of the abandonment. They allege also that, at the time of the execution of the assignment of the leases to appellant, the same were of the reasonable value of $94,000; that, by reason of the default of appellants in the operation and production of oil, and the abandonment, the appellees' title to same had been totally destroyed, and they had thereby been damaged in the sum of $94,000.

The appellants answered by general and special exceptions, and general denial, and specially certain grounds not deemed at this time necessary to be noted further than they allege a partnership agreement between appellant and appellee to operate and produce oil from the leases, specifically also denying

want of care and diligence on their part and setting out certain provisions of the lease contract and of the contract between the parties as controlling appellant's obligation in the premises. The appellees, by supplemental petition, deny partnership under oath. The case was tried to a jury on special issues. The issues and answers thereto are as follows:

"Special Issue No. 1: Did the defendant sink as many wells on the property described in plaintiff's petition as the exercise of reasonable diligence and care would have suggested under all the circumstances? Answer Yes or No. Answer: Yes.

"Special Issue No. 2: Did the defendant, after it began to develop said property, described in plaintiff's petition, for oil, sink as many wells as the exercise of reasonable diligence and care would require under all the circumstances in order to extract the oil from under said premises and to protect said property from drainage of oil from wells drilled on adjacent tracts of land? Answer Yes or No. Answer: No.

"Special Issue No. 3: After the defendant began the development of the property described in plaintiff's petition, did it exercise reasonable care and diligence in drilling and completing said wells on said premises in such time as such care and diligence would suggest under all the circumstances? Answer Yes or No. Answer: No.

"Special Issue No. 3a: After the defendant had drilled the six wells, or any of them, upon the property described in the petition, did they exercise reasonable care and diligence in operating said wells for the purpose of producing oil from said leased premises? Answer Yes or No. Answer: No.

"Special Issue No. 4: If you have answered special issues Nos. 1, 2, 3, or 3a in the negative, then did the plaintiff lose any production from said leases by reason of the failure, if any, on the part of the defendant, as mentioned in said special issues? Answer Yes or No. Answer: Yes.

"Special Issue No. 5: If you have answered special issue No. 4 in the affirmative, then you will estimate the reasonable market value of all oil, if any, which you have found was lost, if any, by the plaintiff in your preceding answer. Answer in dollars and cents. Answer: $54,633.

"Special Issue No. 6: When did the defendant abandon the lease in question? Answer by stating the date. Answer: About November 1, 1919.

"Instruction A: In connection with the preceding special issue, you are instructed as follows: Abandonment is a matter of intention and takes place whenever the claimants go away with no intention of returning.

"Special Issue No. 7: Was such abandonment with the consent of plaintiffs? Answer Yes or No. Answer: No.

"Special Issue No. 8: Did the plaintiff have notice of the abandonment or intention to abandon in time to go upon said premises and operate the same in time to prevent a forfeiture of said leases? Answer Yes or No. Answer: No.

"Special Issue No. 9: If you have found

that the plaintiff suffered any loss of production, then find how much of such loss, if any, occurred after the date named in your answer to special issue No. 6. Answer in dollars and cents. Answer: $8,000.

"You are instructed that the term 'oil in paying quantities,' as hereinafter used, shall be held to mean that quantity of oil as will bring on the market at the time and place of its production a sum of money sufficient to defray all reasonable cost and expense of its production, leaving a sufficient margin of profit to reasonably justify the necessary efforts to obtain it. In the light of the foregoing definition, you will answer the following special issue:

"Special Issue No. 10: Were the wells, or either of them, on the 9.4 acres in controversy producing oil or by the exercise of reasonable diligence would they have produced oil in paying quantities at the time that the defendant ceased to operate the same or any of them? Answer Yes or No. Answer: Yes.

"Special Issue No. 11: Was the defendant, Humble Oil & Refining Company, guilty of gross negligence towards the plaintiff in this case in the development of the 9.4 acres involved in this suit? Answer Yes or No. Answer: No.

"Special Issue No. 12: Was the defendant Humble Oil & Refining Company guilty of gross negligence towards the plaintiff in this suit in its operation of the well upon the 9.4 acres involved by this suit? Answer Yes or No. Answer: No.

"Special Issue No. 13: Find whether defendant, at the time it ceased to pump and produce oil on the 9.4 acres in controversy, honestly and in good faith believed that a further continuance of operations on said lease would be unprofitable. Answer Yes or No. Answer: Yes.

"Special Issue No. 14, requested by the defendant: Did the defendant in good faith believe that the number of oil wells drilled on the Phillips and Parsons tracts were sufficient in number to reasonably obtain the oil from under said lease in view of the surrounding circumstances at that time? Answer Yes or No. Answer: Yes."

Based on the findings of fact by the jury, the court rendered judgment in favor of appellees and against appellant for the sum of $62,633.

It is not believed necessary at this time to make a statement of the evidence. In considering the assignments we will state such of the evidence as shall be necessary to dispose of them. The appellee excepted to that portion of the petition alleging representations made by appellant with reference to the development and operation of the leases and the agreement to begin operations at once as the main consideration for the contract and assignment of the leases. The trial court overruled the exceptions. The exceptions in substance in the petition alleged the contract to be in writing, which contained no such recitals, and there is no allegation that it was omitted through fraud, mistake, or accident, and relates to matters foreign to such contract. Objection was also made to the testimony of Strauss as to such

agreement. The bill sets out the testimony as follows:

"Q. Now, what was the consideration? Just state to the jury what was the consideration, and what led up to the making of the transfer by you to the Humble Oil & Refining Company (meaning the contract and assignment), and what representations, if any, were made to you by the Humble Oil & Refining Company or its agents? A. The moving consideration was the development of this property by the Humble Oil & Refining Company and returning to us our money, drilling a well without cost to us, and even in the event it was a dry hole. If it was a paying well, the agreement was that they take out the cost of the well, and if it was a dry hole it was to be without cost to us, and I was further reminded by Mr. Blaffer, the manager of the company, that they had the organization, a fine equipment, and relied upon him to drill and operate the property and to drill and protect it from drainage. He said that his interest and my interest were alike, and that they were plenty able to protect the property, and reminded me of their activity up here, and he had previously told me about the enormous amount of equipment they had on hand, casing, etc. I will not be sure about it, but he told me the figures at that time—the amount—and it was several million dollars they had in equipment and casing, and having that in mind and the statement he made to me at this time."

In addition to the above, the witness testified:

"During the conversation with Blaffer, before entering into the contract I told him that the leases were regular in every respect, and that they did not require any drilling for six months, but that the moving consideration was our money back, half of the production, the drilling of the first well without cost to us and without loss of time, and within a reasonable time, and, if I had known that they would not carry them out, we would not have entered into the contract."

The appellant also took a bill of exception to the latter part of the above quotation, because it assumed the existence of a fact that had not been proven.

[1] The whole of the allegation with reference to representation as to ability to begin development at once and fully develop before entering into the contract was offered as asserted in the pleadings and by the question to the witness as the main consideration for the contract and the assignment of the leases. It is sought by appellees to show that the pleadings and the testimony fall within the exception to the rule excluding prior negotiations and oral terms of the contract. It is, of course, a well-recognized rule that the consideration of a written contract may be shown by parol, or additional consideration may be shown to that expressed in the writing by parol. But, where a consideration is contractual, it cannot be proven by parol, and especially is this true where it would vary the terms of the con-

tract or add to or take from the obligation expressed in the writing. Where the recital of the consideration is something more than a mere receipt or recital, and embodies the terms of the contract, it is subject to the general rule excluding parol evidence of additional terms, in spite of the fact tnat they may constitute part of the consideration. Where the consideration recites an executory agreement, it is generally regarded as contractual. 4 Encyc. of Ev. 200. If the purported testimony tends to change the writing as an obligation, it should be rejected. It cannot leave the field of mere recital and enter the field of contract, thereby creating and attesting rights.

."It is true that sometimes parol evidence of a consideration different from or additional to that stated in a writing may be received without violating the rule that parol evidence will not be admitted to vary, contradict, or add to the written contracts of parties. It is unnecessary that we should restate the limits of this doctrine, so often explained. It certainly has no application to a case where the considerations for the acts or agreement of one party or the undertakings of the other and both are stated in writing, which is the case here. If it is admissible for the vendor to show that the vendees were to pay more for the property than stated in the contract, it would be equally admissible for the vendees to show that the vendor was to deliver more lumber or other property for ' the price stated. This would wholly ignore the rule on the subject." Coverdill v. Seymour, 94 Tex. 8, 57 S. W. 39; Rapid Transit Co. v. Smith, 98 Tex. 553, 86 S. W. 322; Kahn v. Kahn, 94 Tex. 114, 58 S. W. 825; Paris Grocery Co. v. Burks, 101 Tex. 106, 105 S. W. 174; Matheson v. C-B. Live Stock Co. (Tex. Civ. App.) 176 S. W. 734; Boone v. Microw, 33 Tex. Civ. App. 295, 76 S. W. 772; McCullough v. Farmers', etc., 58 Tex. Civ. App. 160, 123 S. W. 439; James v. Doss (Tex. Civ. App.) 184 S. W. 623; Burt v. Deorsam (Tex. Civ. App.) 227 S. W. 354; Harper v. Lott, etc. (Tex. Com. App.), 228 S. W. 188; Sullivan v. Schreiner (Tex. Civ. App.) 222 S. W. 'at page 317; 10 R. C. L. p. 1044, § 238.

The appellant cites and quotes from the above section R. C. L., but appellee, in reply, quotes and underscores the following from that section:

"But if the instrument states a contractual consideration parol evidence is not admissible to vary or contradict the consideration expressed"

—and insists that the above is not in accord with the rule in Texas. An examination of the authorities above cited, both from the Supreme Court and the Court of Civil Appeals, we believe will evidence that this state follows the rule as announced by R. C. L. It is pleaded and asserted in this case appellant, as assignee, was bound by the covenants in the leases, which evidently are obligations for the benefit of the lessor, for the reason that the contract between the parties hereto August 1st stipulated appellant agreed to comply with the terms of tne leases to drill, as required by their terms. If this is true, then they were not bound to drill for six months unless there was a 200-barrel well in 200 feet of the lines of the leases, brought in and after 80 days' consecutive production. Certainly an oral agreement to commence development at once —that is, August 1, 1918—is a different agreement to the obligation in the leases. Under the contract of that date the parties evidently contemplated that appellants should begin drilling under the terms of the leases. This contract further evidences that there would not be put down but one well at the beginning. If it was dry it was at appellant's cost; if it was a producer then appellant was to be reimbursed from the sale of the oil. If production was found, then appellees should pay one-half of the necessary cost of further drilling. Under the verbal contract, in addition to beginning at once, appellant represented it had the organization and equipment to drill and operate, so as to protect the property from drainage; that appellant was able to protect the property. By the contract the appellant was only to furnish half of the ability, while under the verbal contract they agreed that they were to protect the property by drilling, the implication being its own resources would ne used. The appellees do not plead they offered or tendered their half for adaitional wells, or offered at any time to do so, evidently relying on the oral representation and proposals alleged and proven. The oral contract made an entirely different one from the written, under the guise of proving the consideration of the written contract. This, in our judgment, cannot be done.

[2] It is urged, since there was an implied covenant in the leases and in the written contract and assignment to protect the premises from drainage or waste of the products under the land for which he was given the exclusive right on the land to produce and save, the oral contract did not materially change the obligation on appellant which required him to do that which would be reasonably necessary. Guffey v. Chaison (Tex. Civ. App.) 107 S. W. 609; Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464; Burt v. Deorsam (Tex. Civ. App.) 227 S. W. 354; Blair v. Clear Creek Oil & Gas Co., 148 Ark. 301, 230 S. W. 286; Steel v. American Oil Development Co., 80 W. Va. 206, 92 S. E. 410, L. R. A. 1917E, 975. It will be noted the leases were executed July 27, 1918, and contract between the parties hereto and the assignment were executed August 1, 1918. The discovery well is alleged to have been July 27, 1918, and the testimony shows that during the months of August and September many wells were being put down in and around this property and in the town of Burkburnett, etc. The

appellant commenced drilling on the Phillips tract September 27, 1918, and the second well thereon October 21, 1918. It began drilling on the Parsons tract December 12, 1918. The sixth clause of the leases, as above set out, was evidently intended to accelerate the time for beginning operations. The condition which would have accelerated operation was a 200-barrel well, producing for 30 consecutive days within 200 feet of the lines of the respective tracts. Again, it was the evident purpose of appellees to have a test made on one or the other of the tracts, free of cost to them. If it should be dry, they were to pay nothing. If a producer, appellant was to be reimbursed out of the oil therefrom. If other wells were put down after a producing well was secured, appellees were to pay half the cost of doing so. Assuming an implied contract would require under the circumstances surrounding the parties when they made the contract that appellant at once begin operation to preserve what is termed in this case flush production, and a failure to do so would lose to the premises such production: The leases and contract did not leave the parties to such implied covenant to begin operation. They undertook to provide against drainage by accelerating operations, and further restricted it to one well for test purposes; appellants to relieve, for this purpose, appellees of cost in such an exploration. Its contract is not subject to the interpretation that it undertook to put down before discovery of oil on the land additional offset wells in anticipation of the drainage. The express agreement with reference to the thing implied to be done will exclude the implied covenant until at least the appellant actually began operation on the two tracts of land, on the Phillips tract September 27th and the Parsons land December 12th. Until such time the parties were bound by the express agreement, and as contained in the leases and the contract.

"Where parties have expressly agreed on what shall be done there is no room for implication for anything not stipulated for." 18 R. C. L. 1213.

We think neither party will be relieved of the express terms of their contract because it may work a hardship on them, or either of them. The appellees were not entitled to recover damages for failure of the appellants to commence exploration of the land for oil. The case of Burt v. Deorsam (Tex. Civ. App.) 227 S. W. 354, considered a clause almost exactly like clause 6 in the leases here. It was contended therein the implied obligation to sink offset wells in the lease rendered the express clause invalid as a consideration. The reasoning in that case is of value on the contention here that the parol contract did not add any more than the implied covenant did to the contract.

Blair v. Clear Creek Oil Co., 148 Ark. 301, 230 S. W. 286, clearly states the lessor cannot recover damages for failure to commence exploration for oil under a contract giving the lessee an option to begin drilling or paying rent, citing Carper v. United Fuel Gas Co., 78 W. Va. 433, 89 S. E. 12, L. R. A. 1917A, 171. The note in the latter report at page 178 is as follows:

"And in line with the rule it has also been held that if the lessor accepts the specified consideration for delay in development, he is as much bound by it as if the end of the paid period was the time limit stipulated in the original contract, and he cannot make complaint of the lessee's failure to develop until the expiration of such time. New American Oil & Mining Co. v. Wolfe (1906) 166 Ind. 705, 76 N. E. 255; New American Oil & Mining Co. v. Trayer (1905) 166 Ind. 402, 76 N. E. 253, 77 N. E. 739; Consumers' Gas Trust Co. v. Littler (1904) 162 Ind. 320, 70 N. E. 363. And in harmony with this rule is the holding in Carper v. United Fuel Co., ante, 171, to the effect that the lessor cannot hold the lessee in an oil or gas lease for damages for failure to develop the leased premises during the term for which he has accepted a delayed rental or minimum royalty, if gas or oil wells have not been developed, and the lessee's only interest in the premises is his license or permission to develop the same."

See, also, Guffey v. Chaison, supra.

[3] It is apparent from the pleadings and evidence in this case appellees sought to recover damages for the period of time appellants delayed beginning operations on the two tracts of land, although under the leases and the lease contract they were not legally bound to commence operations at once or upon executing the assignment to them. The issues, it appears, confined the jury to damages occasioned after operations were begun, yet the pleadings and the testimony were not so confined. The jury doubtless considered such evidence, as it was admitted for their consideration, and we believe the court should have sustained the exceptions to the pleadings and the objections to the evidence.

However, in submitting the issues to the jury, it will be noted the issues as submitted do not take cognizance of the fact that there are two separate tracts of land, two separate leases, and two separate owners, or lessors. While the covenants in the two leases are the same, the operations on the tracts were begun at different times—on the Phillips tract September 27th and on the Parsons tract December 12th. The issues as submitted would permit recovery for loss from the time operation was begun on the first tract, while under the Parsons lease no recovery could be had for loss thereon until operation had begun under it. It is probably true the jury found loss as to both tracts from the date operations began on the first tract, and the pleadings and evidence to which objections were made doubtless induced the jury to look to the parol testi-

mony, and the trial court was induced to submit the issue as it did.

Appellants also assert error in overruling special exceptions to the petition in that part thereof seeking a recovery of damages for delay in beginning operations. As pointed out above, the exception we think well taken. It is insisted, however, no injury resulted because no issue was submitted authorizing recovery for such damages, but only those which occurred after operations began. As above pointed out, the issue did not take cognizance of the two leases or separate tracts of land and the difference in the time of beginning operations on the two tracts. The jury doubtless awarded damages for not beginning work on the Parsons tract under the theory that operations were begun on the Phillips tract; that this was the beginning of operations under the issues submitted. Especially this may be true as the court, in his charge to the jury defining the duties of appellant under the contract and the leases, told the jury when appellant undertook to develop the oil and gas leases in question there was an implied obligation resting upon it to use reasonable diligence and care to develop and protect the property embraced in the lease, and this obligation required it to sink as many wells and within such time as the exercise of such diligence and care would suggest under all the circumstances. Under the issues and the charge and upon the testimony introduced we cannot say no injury resulted.

The third proposition will be overruled. We believe we have sufficiently expressed our view as to the contention here made.

[4, 5] As to the fourth proposition, asserting error in permitting the witness Strauss to answer whether or not oil wells drilled thickly around a given area will draw oil from surrounding land, to state that it would do so: Whether such drilling will do so or not we believe to be a proper question for expert knowledge and opinion. If the witness was qualified as an expert, we believe he may give his opinion on a question properly framed. Under the statement in the brief, we cannot properly determine this matter. Ordinarily, qualification of an expert is largely in the discretion of the trial court. We are unable to say reversible error is shown by this assignment. As to the manner of proving drainage, we refer to the cases of Burt v. Deorsam (Tex. Civ. App.) 227 S. W. 354 (9); Blair v. Clear Creek, 148 Ark. 301, 230 S. W. 286 (9); Steel v. American Oil, etc., 80 W. Va. 206, 92 S. E. 410 (5), L. R. A. 1917E, 975.

[6] The fifth proposition relates to the action of the court in excluding rule 37 of the Railroad Commission, which in effect forbids operators drilling wells for oil nearer than within 150 feet of the line of a lease, and that wells shall not be drilled in 150 feet of the boundary line of the lease, or nearer than 300 feet of each other. The objection urged in the court below, and sustained, was that the Railroad Commission had no power to make or promulgate such rule or order. The appellant has not favored us with even a citation of the act of the Legislature granting the power to the Railroad Commission. We, however, think the Legislature has the power to authorize rules for conserving and preventing waste of oil. Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729. It is probable under the issues in this case no injury resulted in excluding the order; at least no injury is shown or pointed out by the assignment. We do not believe we should discuss this assignment further in the present condition of the record, and refrain from further expressing any view on the issue attempted to be presented in this court.

[7] The sixth and seventh propositions are predicated on the admission in evidence of the opinion of Strauss, to the effect that at least nine or ten wells in the immediate vicinity of the Parsons tract of land drained it, and his further testimony as to how he arrived at what the two tracts of land would produce in barrels, and in permitting him to state that it was 50,000 barrels per acre, i. e., the Parsons lease would have produced 150,000 and the Phillips lease 250,000; that he arrived at this conclusion by the production of other wells, the thickness of the sand, and the porosity of the sand, the flush production, and what the wells on the property produced, taking the days they drilled; and also objections to the opinion of Creag as to the amount per acre the tracts would produce. The testimony of the witnesses was objected to on the ground that they simply expressed an opinion, that it was too remote and uncertain, and that the witnesses were not qualified to answer or give an opinion. As heretofore suggested, a witness may give his opinion if he has sufficient knowledge or experience in such matters. We have not examined the testimony as to the qualification of the witnesses to express an opinion, and at this time express no views thereon. Usually to take the opinion of an expert a hypothetical question should be framed on the facts. It is difficult to state upon just what facts the witnesses based their opinion. As to the amount of oil per acre, we should think this would depend upon the location of the oil pool, if known, and the relative position of the tracts of land thereto, whether the pool is uniform or otherwise, and how far in the particular strata in which the oil was found one well will drain another; that is, the radius of drainage therein. The probable drainage must necessarily be established by experts under a given state of facts or circumstances. The trial court should see to it that the witness' opinion is not based upon improper facts or upon an unimportant hy-

pothesis, and one not supported by the facts. These observations are suggested for the reason neither of these witnesses appear to be scientific men, but they do appear to have been men who were dealing in oil and working in the oil fields, and from their knowledge obtained by a practical observation their experience perhaps is such as would enable them upon stating the facts to express an opinion. · We again refer to the authorities above cited on the method of proving damages in this character of action.

[8] The ninth assignment is based on the refusal of the court to give special issues requesting the jury to find how many wells were drilled in 200 feet of the lines of the two tracts producing 200 barrels per day for thirty consecutive days, and whether appellant began drilling on the land before the time any such wells had been drilled, and to find the amount of oil drained from the land by such wells not offset. These charges were evidently based upon the sixth clause of the leases. We have reached the conclusion this clause will not control the question of drainage after operations began. The implied obligation would seem to be upon the lessee under the leases to prevent waste by drainage after operation has commenced. Before operation commenced there was no covenant implied to prevent drainage during the six months for which the lessor had accepted payment for the deferred period of operation. The lessee was under no obligation to begin unless the conditions mentioned in the sixth clause arose. This condition was evidently inserted to accelerate operations before the contract period for beginning operations, and was not to control after operations were started. If the evidence should show drainage after operations started, then, at whatever distance a well may be placed, and of whatever capacity, if it wasted the oil on the premises the duty to save from such waste then arose which would not be controlled by the express agreement inserted for acceleration.

[9, 10] Under proposition 10 it is asserted that issue No. 2 set out combined two issues in one, and, as submitted, had a tendency to confuse the jury. The same objection is urged as to issue No. 10. It will be noted as to issue No. 2 the jury were asked after operations began if appellant sank as many wells as reasonable diligence required under all the circumstances to extract the oil from under the premises, "and to protect said property from drainage of oil from wells drilled for oil on adjacent tracts." The jury found in answer to issue 1 that appellants did sink as many wells as the exercise of reasonable diligence and care would have suggested under all the circumstances. If the appellant did sink as many wells as diligence and care required, there was no liability for drainage, because enough wells were not put down

to prevent drainage. There is no implied obligation to guarantee that drainage will not occur. To extract the oil from the premises it is only necessary to sink sufficient wells to do so. After the lessee has developed a producing well the advisability of drilling additional wells involves the business judgment of the lessee for he is not to drill unprofitably to himself and for the benefit of the lessor alone. It is sometimes said if he acts in good faith and makes no fraudulent use of his opportunities no liability is shown. However, it seems to be the weight of authority that neither the lessor nor the lessee is the ultimate arbiter of the extent of development required, but both are bound by what would be reasonably expected of operators of ordinary prudence, having regard to the interest of both. Or, stated differently, when the lessee has in part developed the leased premises, and produc wells, in such case he is liable to the lessor for breach of his implied covenant sufficiently to develop the land to protect it from wells on adjoining property, although the lessor has received a rental or royalty upon the oil or gas produced from the land leased. Brewster v. Lanyon Zinc Co., 140 Fed. 801, at pages 813, 814, 72 C. C. A. 213; Daughetee v. Ohio Oil Co., 263 Ill. 518, 105 N. E. 308; Jennings v. Southern Carbon Co., 81 W. Va. 347, 94 S. E. 363; Carper v. United Fuel Gas Co., 78 W. Va. 433, 89 S. E. 12, L. R. A. 1917A, 171, and authorities heretofore cited.

We do not interpret issue No. 2 as submitting two issues in one. If as many wells were put down as diligence required, under the circumstances, to extract the oil from the premises, this would protect it from drainage from wells on adjacent premises. The difficulty we have is in reconciling the answers to issues 1 and 2. It appears to us the issues in the two are in effect the same, but the answers are contradictory. This, we think, is true, for the reasons given in holding issue No. 2 did not submit two issues. If the answers are contradictory, then no finding is made by the jury that appellant was negligent under the circumstances in sinking as many wells as proper care would suggest or require; and hence no damages would be recoverable therefor. But, under the fourth and fifth issues, the jury were authorized to allow damages for an insufficient number of wells, and by their answer they appear to have done so. We cannot tell, and neither could the trial court, what part of the $54,633 was assessed as damages for the failure to sink as many wells as the circumstances suggested. There were six wells put down on the two tracts. Strauss testified there should have been put down twelve wells. The jury evidently did not agree with him. It will be noted this issue did not call upon the jury to determine if the wells were drilled at the proper place for

the purpose of offsets, or if a sufficient number were sunk within time to prevent drainage, but the jury were only asked to find whether there were as many wells sunk as the circumstances would suggest, which we interpret as being substantially the same in both issues. We think it is apparent there is fundamental error in the verdict and the judgment. We shall overrule the objection to the tenth issue submitted.

Proposition 11 assails issue 3a and issues 4 and 5 as having no evidence to authorize their submission, and that the evidence is insufficient to support the finding of the jury as to them. We will not discuss the evidence. We believe we can render sufficient assistance or service in this case upon another trial by referring to the decisions heretofore cited from the various courts, especially those from our courts and the Arkansas court, with reference to the quantum of evidence necessary to establish damage in this character of case.

[11, 12] The twelfth proposition is based on the failure of the trial court to instruct on the burden of proof as to issues 10, 11, and 12. The burden to establish the affirmative of the issue was upon the plaintiff. The mere failure to so instruct is not necessarily reversible error. The appellant, we believe, should have requested a proper charge thereon. We believe the trial court properly refused special charges under propositions 13 and 14. They in effect are general charges, while this case was submitted upon special issues. They are not properly explanations as to the issues submitted, as required by the statute. Such charges, under the circumstances, were properly refused. Railway Co. v. Harrington (Tex. Com. App.) 235 S. W. 188. We also believe the propositions of law contained in the requested charges are not correct. Our view upon this question we think is sufficiently indicated from what has been said above.

[13-18] The seventeenth and eighteenth propositions assert that appellees were in no sense the lessors of appellants, but under the contract the relation of the parties was that of partners, and, on the findings of the jury to issues 1, 11, 12, 13, and 14, the trial court should have rendered judgment for the appellants. It is true, we think, that the appellees were not lessors, but the contract between appellant and appellees obligated the appellant to drill and comply with the terms of the leases assigned. If it failed to do so, in breaching the leases or the covenants thereof it breached the contract made with the appellees, upon which we believe they had a cause of action, unless the relationship of partners existed, and changed the measure of duty by which it is insisted a partner is not liable to his copartner for a loss caused by an honest mistake of judgment, unless it amounts to gross negligence.

There is no finding in this case by the jury whether there was a partnership between the parties or not, and, if necessary to support the judgment, we may impute to the trial court the finding that there was none. The contract and assignment between them does not necessarily create that relationship in our judgment. While there may have been an interest in the oil produced from the leased premises, the assignment placed the title thereof in appellant, with the right of possession and the right alone to work it. It may be the proper interpretation of the contract would be that the oil was part of the consideration for the assignment from appellees to appellant. A partnership as between parties to it is largely one of intention. Fink v. Brown (Tex. Com. App.) 215 S. W. 846. The appellant was a corporation, and as a general rule cannot enter into partnership relations with other parties. But sometimes after the execution of such a contract courts will sustain the relation to prevent injustice. For a discussion on this point we refer to Millers' Indemnity, etc., v. Patten (Tex. Civ. App.) 238 S. W. 240, rendered by Mr. Justice Boyce of this court. There will be no presumption that the parties intended to enter into an ultra vires contract, but the presumption is that they knew the powers of the corporation and the law with reference thereto, and that they intended to obey the law. The trial court was therefore justified in finding there was no partnership. We believe the obligation implied under the contract is to produce and save the oil on the premises, and that the covenants in the contract and in the leases to prevent waste is as much for the benefit of the appellees herein as to the lessors under the leases.

The judgment will be reversed and remanded for the reasons above given.