**J. Thomas PRICE, Jr., Appellant,**

v.

**J. D. (Jack) WRATHER, Jr., Appellee.**

No. 17260.

Court of Civil Appeals of Texas.

Dallas.

June 6, 1969.

Rehearing Denied July 3, 1969.

Robert R. Bradshaw, of McKenzie & Baer, Dallas, for appellant.

Robert F. See, Jr. and Stanley E. Neely, of Locke, Purnell, Boren, Laney & Neely, Dallas, for appellee.

DIXON, Chief Justice.

Appellant J. Thomas Price, Jr. brought this suit against appellee J. D. (Jack) Wrather, Jr., alleging that in the year 1947 he entered into a joint venture agreement with Wrather which agreement continued over the years until the date of the filing of this suit in 1966. Appellant seeks to establish an interest in numerous oil and gas leases, a number of radio and television stations, stocks in corporations and hotels. He also asks for judgment for $750,000 damages, $35,000 for expenses incurred and for an accounting for all purchases, sales and profits pertaining to the properties involved.

The court rendered a summary judgment that Price take nothing by his suit.

The record consists of the pleadings, affidavits of both parties, answers of Price to interrogatories and the depositions of both parties. The depositions are lengthy, those of Price taking up 783 typewritten pages and those of Wrather 210 pages.

In his first and second points of error appellant asserts that the court erred in granting summary judgment because a fact issue exists as to the agreement between the parties in regard to a joint venture. We do not agree with appellant.

The general nature of Price's cause of action is made clear by certain allegations in his Original Petition, from which we quote excerpts as follows:

"In the year 1947, Plaintiff and Defendant entered into a joint venture whereby the parties were to acquire certain interests, * * *. During the course of said joint venture from 1947 to date, certain oil, gas and other mineral interests were acquired by the parties hereto. * * * Plaintiff has expended in excess of the sum of $35,000.00 in expenses. Said sums were necessary to be expended for the acquisition of the properties which are the subject matter of this law suit."

In his prayer Price asks for damages, expenses, title to his alleged interest in the various properties and "For a full and complete audit and accounting of the affairs of said parties *from 1947 to date.*"

Similar allegations are contained in Price's amended answer to Wrather's motion for summary judgment and in his affidavit in support of his amended answer.

■ Price's statements that he entered into a joint venture with Wrather, whether made in the pleadings or the testimony, are conclusions of law, not of fact. Graham Hotel Corp. v. Leader, 241 S.W. 700, 701 (Tex.Civ.App., Fort Worth 1922, no writ); International Harvester Co. v. Campbell, 43 Tex.Civ.App. 421, 96 S.W. 93, 96 (1906, no writ); Worsham v. Vignal, 14 Tex.Civ. App. 324, 37 S.W. 17, 20 (1896, no writ); McCormick and Ray, "Texas Law of Evidence", Sec. 1423 (2d Ed.).

■ Being conclusions of law the statements above referred to have no probative force in summary judgment proceedings. With respect to the question of joint venture in this case we must look to the facts, not the legal conclusions of the parties. Whether the given facts show that the parties were engaged in a joint venture, or whether the evidence raises a fact issue on the question, is then for the court to decide as a matter of law. Sparkman v. McWhirter, 263 S.W.2d 832, 838 (Tex.Civ.App., Dallas 1953, writ ref'd); Bates v. Smith, 155 Tex. 443, 289 S.W.2d 215 (1956); Hutchinson v. City of Dallas, 290 S.W.2d 253, 257 (Tex.Civ.App., Dallas 1956, no writ); Dickey v. Bird, 366 S.W. 2d 859, 863 (Tex.Civ.App., Amarillo 1963, writ ref'd n. r. e.); Betts v. Betts, 395 S.W.2d 673, 675 (Tex.Civ.App., Amarillo 1965, no writ).

■ After a careful examination of the facts as distinguished from conclusions of law in this case we have concluded that no genuine issue of material fact exists in regard to appellant's claim of joint venture. Our conclusion is based on the

pleadings, answers to interrogatories, affidavits and depositions of the parties; but mainly on the judicial admissions and the testimony of Price himself. From 1947 to 1951 he was a full time employee of the telephone company. From time to time on weekends and other spare times he performed services for Wrather as an independent contractor in locating oil leases. If Wrather purchased a lease found by Price he would give the latter an interest in the lease as a commission. This relationship was renewed in 1951 and continued until 1954. In the last named year Price was employed by Wrather as a full time "land man" at a salary of $750 per month and a royalty interest in oil and gas leases which he brought to Wrather and Wrather purchased. Price was also given an expense account. In 1956 Price left the employ of Wrather and set up his own office as an independent broker. During this time Wrather paid him a monthly retainer plus expenses for first options on oil and gas leases and other investments that Price might discover. In 1958 Price moved to California and became a vice-president at a salary of $20,000 a year of The Lone Ranger, Inc., a company in which Wrather had an interest. In 1961 he became an employee of General Television, Inc., another corporation in which Wrather had an interest. In 1962 Price and Wrather severed all business relationships.

Price's own testimony shows that there was no joint venture agreement entered into between the parties in 1947. We quote excerpts from his testimony: (In all cases in this opinion the emphases are ours.)

"Q Did you do anything in connection with the oil business after World War II?

A Yes, Sir.

\*   \*   \*   \*   \*   \*

Q What was it?

A Checking oil deals as to the land values, validity of oil and gas leases.

\*   \*   \*   \*   \*   \*

Q How did you happen to do that?

A I was asked to.

Q By whom?

A J. D. Wrather Jr.

Q Well, for friendship or was he going to pay you for it?

A *I think I got my expenses and if it produced, I was to get something, I don't remember the arrangement.*

Q Did any production result?

A No, it was a dry hole.

\*   \*   \*   \*   \*   \*

Q And is that the extent of your activities in the oil business in 1947?

A I don't think so.

Q Well, what else did you do?

A I did some land work in West Texas.

Q What county?

A I don't recall right now. \* \* \*

Q Was a well drilled?

A I'm not sure.

\*   \*   \*   \*   \*   \*

Q Did you do anything else in the oil business in 1947?

A I don't recall right now. It's been a long time ago.

Q But that's all you can remember?

A Right now, yes.

Q Well, the only thing you did in the oil business for J. D. Wrather, Jr. in 1947, was this checking in Fannin County which resulted in a dry hole; is that correct?

A It's possible I did some more for him of which I don't remember now.

\*   \*   \*   \*   \*   \*

Q *Well, did you get your expenses?*

A *I presume I did, I don't recall exactly.*

\* \* \* \* \* \*

Q *Are you basing any of your claims in this lawsuit on anything Jack Wrather said to you in 1947?*

A *I'm not sure. I don't recall right now,* but we did have some, some form of arrangements in 1947.

Q What were they?

A I don't recall. \* \* \*

Q So you don't recall any arrangement with Jack Wrather in 1947 on which you are basing any claims in this lawsuit?

A *I don't know what the arrangement was,* or were, but I will say that whatever they was or were, was very satisfactory to both of us.

Q But you don't have any recollection of having made any agreement or arrangement in 1947 with Jack Wrather?

A *Yes, we made arrangements and agreements, I'm sure, but I don't remember what they are.*

\* \* \* \* \* \*

Q All right. Anything else in '47?

A I've told you.

Q *You told us that you were to get your expenses and if the well produced, you were to get something, which you didn't remember what it was?*

A *In what deal?*

Q *In 1947?*

A *That's correct."*

An analysis of the pleadings and the evidence in this case shows clearly that in the oral agreement of 1947, and in other later oral agreements between Price and Wrather, the necessary elements of a joint venture are missing. (1).There was no mutual right of control. Wrather alone was in control.[1] (2) There was no com-

1. In re the right of control:
In his Original Petition Price alleged, "After the Plaintiff and Defendant became associated in business together, the Defendant handled and managed all of the business of said joint venture and received and managed all of the assets and monies acquired *pursuant to the agreement between the parties.* This is a suit for an accounting \* \* \*."

Also with reference to right of control we quote from part of Price's deposition:

"Q Were you supposed to be working full-time when you were drawing that $20,000, or $24,000 a year from Lone Ranger in '58 on?
A Yes.
Q Doing whatever you were instructed to by your superiors?
A *I only had one superior, that was Jack Wrather, and I was doing what was required of me to do my job.*
\* \* \* \* \*
Q Are you claiming that you had any arrangement with Jack Wrather with reference to the Kona Kai Club?
A *I left it up to him.*
\* \* \* \* \*
Q Mr. Price, on Plaintiff's Exhibit 9, a letter from you to Monte Livingston dated March 31, 1965, you make certain demands; is that correct?
A That's correct.
Q *Would you explain your demands set forth in Paragraph 1?*
A Fine. All people who have been on the payroll of J. D. Wrather, Jr., and other companies associated with him, at the time of the particular employee leaving the company, *it was the policy of J. D. Wrather, Jr., to pay as termination pay one month's salary for each year of service.*
*In connection with Paragraph 1, the termination pay paid to me in the amount of $8,000*—and, incidentally, it was not paid as per the agreement, that, too, was delayed some two and a half years—was a total amount of $8,000.
Based only upon the amount of time from 1958 until 1962, of which I headquartered out of the Beverly Hills office, no consideration was given for my services as to one month's salary for each year of service that I had previously served J. D. Wrather, Jr.
Does that answer your question?
Q *How far back do you claim you served J. D. Wrather, Jr., and were entitled to severance pay?*
A *1947.*

*munity of interest.* There was nothing to prohibit Price, once he acquired an interest in property involved, from holding it or selling it as he pleased independently of Wrather. (3) There was no agreement to share profits as principals. Each party was free to realize profits for himself independently of the other in varying amounts, depending upon the time and condition of the market when each should decide to sell his interest. (4) There was no agreement to share losses, costs or expenses.[2] For instance, Price does not offer to bear any part of the $35,000 he claims he incurred as expenses. Brown v. Cole, 155 Tex. 624, 291 S.W.2d 704, 709, 59 A.L.R.2d 1011 (1956); Luling Oil & Gas Co. v. Humble Oil & Refining Co., 144 Tex. 475, 191 S.W.2d 716 (1945); North Texas Lumber Co. v. Kaspar, 415 S.W.2d 470 (Tex.Civ.App., Dallas 1967, writ ref'd n. r. e.); Kaiser Gypsum Co. v. Jordan, 399 S.W.2d 588 (Tex.Civ.App, Waco 1966, writ ref'd n r. e.); Mummert v. Stekoll Drilling Co., 352 S.W.2d 526, 529 (Tex.Civ.App., Dallas 1961, writ ref'd n. r. e.); 33 Tex.Jur.2d 287–288.

Appellant's first and second points are overruled

\* \* \* \* \*

Q Was there any limit to your expense account?
A No, sir.
Q Who was to approve it?
A Jack Wrather."

2. With reference to sharing losses and expenses we quote from Price's testimony:
"Q Well, then, is it your position that you are obligated to pay a 64th of everything that Jack Wrather paid out in his oil operations?
A No. \* \* \*
Q —you'll claim an interest, if it lost money you'll pass it by?
A I might.
\* \* \* \* \*
Q Are you basing any claim in this lawsuit on anything that Jack Wrather told you in 1950?
A Yes.
Q What?
A There was a general arrangement that we had in connection with all television activity.
\* \* \* \* \*

In his third point Price says that Articles 581–34, 3995a, and 6573a, Sec. 28, Vernon's Ann.Civ.St., are inapplicable to the transactions as alleged in his petition.

■ Art. 581–34, V.A.C.S., is known as the Securities Act. It requires an agent or solicitor for the sale of securities to obtain a license to operate. Price admits he did not have a license.

Art. 6573a, Sec. 28, V.A.C.S., is part of the Real Estate License Act. Price admits that he did not have a real estate dealer's or agent's license.

Art. 3995a, V.A.C.S., is the Statute of Frauds. Price admits that all of his agreements with Wrather were oral.

In overruling appellant's first and second points we have held in effect that the 1947 agreement, and subsequent agreements between Price and Wrather, were not joint venture contracts. They were agreements whereby Price was to be compensated for *services* rendered for Wrather, who was in control of all operations—the compensation for Price at times would be in the form of a salary plus a commission con-

Q And was is that?
A That if a deal was consummated, that is what I would receive.
Q In exchange for what?
A My services.
\* \* \* \* \*
Q In 1949 did you tell Bob Thornton, Jr. that you had agreed with Jack Wrather to put up a certain percentage of the cost of acquiring any TV or radio station in the future that he might enter into?
⊥ No, sir.
Q Well, did you make any such agreements?
A No, sir."
In his Original Petition Price alleged: "During the course of said joint venture from 1947 to date, certain oil, gas and other mineral interests were acquired by the parties hereto whereby *pursuant to the agreement of the parties,* Plaintiff owned a 1/64 of 7/8 of 5/8 *free and clear of all production costs,* of each and every oil, gas and other mineral lease carried in the name of, owned by, or otherwise held by Defendant, J. D. (Jack) Wrather, Jr. \* \* \*."

sisting of an interest in some of the properties involved. But at times he was acting as an independent contractor, and at times as an independent broker. We hold that Articles 581–34 and 6573a, V.A.C.S., above referred to are applicable during the time Price was employed by the telephone company, but on the side in his spare time as an independent contractor he located and sought to interest Wrather in the purchase of oil leases and corporation stocks; and also did so later while he was engaged in business for himself as an independent broker. Great Western Drilling Co. v. Simmons, 157 Tex. 268, 302 S.W.2d 400 (1957). We make no holding in regard to the applicability of Art. 3995a, V.A.C.S.

Appellant's third point is overruled to the extent above indicated.

In his fourth and fifth points Price charges that the court erred because (4) the statute of limitations does not begin to run as to a joint venture until the venture ceases to exist and that the four year statute is applicable in this case; and (5) there is an issue of fact as to whether Price was guilty of laches. We see no merit in either of the above points.

Price himself says that all his agreements with Wrather were oral. He and Wrather never at any time entered into any written contracts.

■ Price filed this suit on February 2, 1966. It is undisputed that he severed all business connections with Wrather in 1962. He contends that his cause of action is not barred because he was a joint venturer with Wrather, therefore his action comes under Art. 5527, Sec. 3, V.A.C.S. This statute provides that actions by one partner against another partner for settlement of partnership accounts may be commenced within four years after the cessation of the dealings in which they were interested together. Even if we were to say that the agreements between Price and Wrather were joint ventures we think the above statute is not applicable. See 33 Tex.Jur.2d 289, 290 and cases there cited.

In Luling Oil & Gas Co. v. Humble Oil & Refining Co., 144 Tex. 475, 191 S.W.2d 716 (1945), our Supreme Court held that "The accrual of a cause of action means the right to institute and maintain a suit, and whenever one person may sue another a cause of action has accrued." The court further held that upon one party's refusal to allow the other to inspect the records of the operation, or upon one party's failure to pay whatever sum was due at the time specified under the terms of the contract, the aggrieved party has the right to compel the other party to pay through a suit in court. *And in applying the rule, said the court, the question as to whether the relationship was one of joint adventure or partnership was not controlling.* In this case Price says that Wrather would not let him examine the records, though over the years he tried to do so many times. He also claims that he was entitled to be paid his compensation upon the completion of each deal.[3]

3. We quote from Price's testimony:
"A Each deal was different. * * *
    *    *    *    *    *
Q You were working on a piece work basis?
A That's right.
    *    *    *    *    *
Q Well, you hired a lawyer, Walter Eley to write a letter for you in 1964?
A That is correct.
Q Prior to that time did you ever make any claim against Jack Wrather for any interest in any TV station?
A Yes.

Q What's the first time you made any such claim?
A Late 1962.
    *    *    *    *    *
Q How did you make the claim?
A Verbally, to J. D. Wrather, Jr.
    *    *    *    *    *
Q You didn't have any set agreement on expenses then?
A It varied from deal to deal, based on what type of transaction it was.
Q Well, how many separate arrangements did you and Jack Wrather have?
A Oh, I don't know, I don't have any idea, 15 or 20, maybe 25.

However as we view it the testimony negates the view that the parties here were engaged in a joint adventure. We have so held in overruling Price's first and second points. Price and Wrather simply had numerous separate contracts—all of them oral contracts. Limitations began to run following the alleged breach of each contract. When Price instituted suit in 1966 limitations had run against him under the two year statute. Price's fourth and fifth points are overruled.

The judgment of the trial court is affirmed.

Q * * * And that was part of the arrangement, that *you were going to get paid right along on your expenses and wouldn't have to wait, would you?*

A That's correct.

* * * * *

Q Well, when did he start owing you anything?

A The day after he purchased KOTV.

Q What did he owe you?

A He owed me the profit derived from the operation of KOTV.

Q *You mean every time, every month when he got some profit you claim he owed you part of it?*

A *I had an interest in those profits each month, yes.*

Q *And you were entitled to get them?*

Q * * * *that you were entitled to get them right along—*

