**R. W. HOLMAN, Appellant,**

**v.**

**Mary Arlena DOW et al., Appellees.**

**No. 7121.**

Court of Civil Appeals of Texas, Beaumont.

May 13, 1971.

Rehearing Denied June 3, 1971.

Andrews, Kurth, Campbell & Jones, Houston, for appellant.

Childs, Fortenbach, Beck & Guyton, Houston, for appellees.

STEPHENSON, Justice.

This is an action for breach of contract, an accounting and for damages. Trial was before the court, and judgment was rendered that plaintiff take nothing. The parties will be referred to here as they were in the trial court and by the names hereinafter designated.

*History and Chronological Development*

A brief resume of the background and development of their transaction is essential for this opinion to be understood.

Defendant Roy Woodside (hereinafter called "Woodside") had been engaged in the oil and gas business for many years. Prior to 1958 Woodside had been negotiating with gas producers in the Mertzon Field located in Irion County, Texas, to gather, compress and process the gas from such field.

During 1958 Woodside also commenced negotiations with W. M. Dow (hereinafter called "Dow"), and A. S. Parks (hereinafter called "Parks") for the construction and operation of the processing plant which would be required if Woodside completed his negotiations with the producer. September 2, 1958, Dow and Parks entered into a letter agreement with Woodside, under the terms of which Dow and Parks agreed to construct and operate the processing plant, and Woodside agreed to construct and operate the gathering and compressing system.

September 5, 1958, Woodside wrote plaintiff a letter setting forth the terms of a proposed agreement for the two to incorporate for the purpose of gathering, compressing and processing gas.

October 31, 1958, Woodside obtained the first gas processing contract as a result of the negotiations with processors in the Mertzon Field, under the terms of which Woodside was obligated to construct, install and operate a gas gathering, compressing and processing system.

December 1, 1958, defendant Gas Enterprises, Inc., a corporation, was chartered by the State of Texas, with plaintiff and Woodside each owning one-half of the capital stock. The Board of Directors was composed of these two and their wives, and Woodside was elected president and

plaintiff acting vice-president, secretary and treasurer.

Also, on December 1, 1958, defendant Mertzon Corporation was incorporated under the laws of the State of Texas with Dow and Parks each owning one-half of the capital stock, and Dow was elected president, and Parks, vice-president and secretary.

December 15, 1958, Woodside assigned all of his rights in the processing contract he had secured, as well as in those he was then negotiating, to Gas Enterprises, Inc., which corporation assumed all of Woodside's obligations under such contract.

February 11, 1959, Gas Enterprises, Inc., and K–B Compression Company entered into an agreement under the terms of which K–B Compression Company agreed to install and operate the gathering and compressing system for the Mertzon Field for which it was to be paid a charge based upon the volume of gas handled.

June 1, 1959, Gas Enterprises, Inc., and Mertzon Corporation entered into the written contract which is the subject matter of this suit. Under this contract Gas Enterprises, Inc., assigned its processing contracts to Mertzon Corporation, and Mertzon Corporation agreed to perform such contract.

Also, on June 1, 1959, a Contemporaneous Letter Agreement was signed by Gas Enterprises, Inc., and Woodside and accepted by Mertzon Corporation. This letter is the primary basis for plaintiff's contention that the Mertzon Plant Contract also covered gas processing contracts outside of the Mertzon Field.

### The Mertzon Plant Contract

The portions of the Mertzon Plant Contract which are relevant to the points of error raised, are as follows:

Paragraph III contained the following provisions, in substance:

(1) Mertzon agreed to pay Gas Enterprises, Inc., in cash each year, a sum equal to 40 percent of the net profit derived from the operation of the processing plant owned by Mertzon Corporation diminished by the net loss or increased by the net profit from operation of the gathering and compressing facilities.

(2) The terms "net profit" and "net loss" were defined.

(3) Mertzon Corporation agreed to prepare and deliver monthly statements reflecting such net profit or net loss to Gas Enterprises, Inc., from both the processing system and the gathering and compressing system on or before the 10th day of each month covering the preceding month's operation.

(4) Mertzon Corporation agreed to cause to be prepared and delivered to Gas Enterprises, Inc., annual statements written 45 days after the end of each fiscal year, such statements to be prepared by a certified public accountant.

(5)a. If there was a "net loss" shown by the monthly statement from the gathering system, Gas Enterprises, Inc., agreed to pay such sum within 10 days after receipt of such statement.

b. If the monthly statement showed a loss from the processing system, Mertzon was entitled to deduct such loss from subsequent net profits that Gas Enterprises, Inc., may have been entitled to.

c. If such monthly statements show a "net profit", Mertzon Corporation agrees to deliver the sum of such net profit to Gas Enterprises, Inc., at the time of delivery of such monthly statement.

d. It was agreed adjustment would be made at the time of receipt of the annual statements on the same basis as above.

(6) Mertzon Corporation agreed to maintain such records and permit Gas Enterprises, Inc., or its duly authorized representatives to examine or audit such records at reasonable times.

Paragraph IV contained the following provisions, in substance:

(1) Mertzon Corporation agreed to maintain ownership of the processing plant during the initial 5-year period, with the exact date that operations had begun to be agreed upon in writing between the parties.

(2) Within 30 days after the expiration of such 5-year period, Mertzon Corporation agreed to convey title to a 40 percent interest in the processing facilities to Gas Enterprises, Inc., with adjustments to be made for replacement to the original plant.

(3) Mertzon Corporation could continue to utilize the processing plant after such 5 years, during the term of this contract, without having to pay rent.

(4) Notice must be given of any expansion of the processing plant, and Gas Enterprises, Inc., could participate in such expansion.

(5) At the termination of this contract all equipment owned as a result of this paragraph would be offered for sale.

Paragraph VI provided in substance that additional wells may be drilled and completed in the Mertzon Field, Irion County, Texas; and the producers thereof might desire to enter into a processing contract with one of these parties, that it was mutually agreed that in the event either of them acquires such a contract by amendment this contract would be amended to cover it.

Paragraph VII provided for the following, in substance:

(1) That it was not the purpose or intention of this contract to create a partnership relationship, and that the relationship between the parties would be that of independent contractors. If they should be required to treat this arrangement as a partnership, then they elected for subsection K of the Revenue Code to apply.

(2) All notices required by this contract to Mertzon Corporation be addressed c/o Leonard H. Childs, and to Gas Enterprises, Inc., be addressed c/o Roy Woodside.

(3) Unless terminated by written consent, this contract should exist for the duration of the last to terminate of the processing contracts.

The trial court made findings of fact and conclusions of law. One of these conclusions of law was that the only relationship between plaintiff and Gas Enterprises, Inc., on one hand, and Mertzon Corporation, Parks and Dow on the other hand, was that of independent contractors and never at any time were these parties partners or joint ventures each with the other; and they did not stand in a fiduciary relationship or a position of trust and confidence. Plaintiff's first point of error is that the trial court erred in failing to hold that by virtue of the provision of the Mertzon Plant Contract, a relation of trust and confidence was raised between Mertzon Corporation and Gas Enterprises, Inc., which was fiduciary in nature. This point is overruled.

Plaintiff conceded at the outset that the relationship created between the parties under the Mertzon Plant Contract might not meet the technical requirements of a partnership or joint venture. It must be kept in mind this is what amounts to a "no-evidence" point, and in passing upon it we must consider only the evidence favorable to the court finding.

It is an elementary rule of law in this state that the burden of proof is upon the person seeking to establish the existence of a partnership or joint-venture relationship, and that the intention of the parties is the real test as to the existence of such relationships. Luling Oil & Gas Co. v. Humble Oil & Refining Co., 144 Tex. 475, 191 S.W.2d 716 (1945); Humble Oil & Refining Co. v. Strauss, 243 S.W. 528 (Tex.Civ.App.—Amarillo, 1922, no writ); Lovell v. Lovell, 202 S.W.2d 291 (Tex.Civ.App.—San Antonio, 1947, no writ); First National Bank of Brownwood v. Chambers, 398 S.W.2d 313 (Tex.Civ.App.—Eastland,

1965, no writ). As mentioned above, in analyzing the Mertzon Plant Contract, the parties stipulated in Paragraph VII that it was not their intention to create a partnership relationship, but on the contrary their relationship would be that of independent contractors.

The fact that Gas Enterprises, Inc., could receive a part of the net profits under the somewhat complicated method of bookkeeping, does not alone determine the question of partnership. Fink v. Brown, 215 S.W. 846 (Tex.Comm.App., 1919) adopted by the Supreme Court. Gas Enterprises, Inc., was to share in the losses only in an indirect manner, and a suit against it would not lie by a creditor doing business with Mertzon Corporation. Further, it is clear that Gas Enterprises, Inc., had no authority to exercise control over the operation of any phase of the business being carried on, and had never made any attempt to exercise such authority. We do not pass upon the question as to whether a partnership would have existed upon a division of the assets at the end of the 5-year term provided. That time had not arrived, and the contingencies had not occurred. Arnold v. Caprielian, 437 S.W.2d 620 (Tex.Civ.App.—Tyler, 1969, error ref., n. r. e.) ; Cearley v. Cearley, 331 S.W.2d 510 (Tex.Civ.App.—Dallas, 1960, no writ). We have concluded from a study of the contract as a whole that plaintiff did not establish as a matter of law, a partnership between the parties; and, therefore, the trial court did not err in failing to hold a relationship of trust and confidence existed between the parties which was fiduciary in nature.

One of the principal areas of disagreement is the accounting system used by Mertzon Corporation, and the related subjects; first, whether Woodside, as President of Gas Enterprises, Inc., had the authority to alter the terms of the written agreement, and second, whether the failure of Gas Enterprises, Inc., to make the payments provided for in Paragraph III, Section (5a) of the Mertzon Plant Contract

legally justified the termination of such contract.

The trial court's findings of fact as to these matters were substantially as follows : That Mertzon Corporation furnished the statements to Gas Enterprises, Inc., in substantial compliance with the requirements of the contract, that certain changes in this provision were agreed upon by the parties, and that Gas Enterprises, Inc., failed to make the payments required of it by the contract. Defendant in this series of points of error challenges these findings of fact as having no support in the evidence. In passing upon them we consider only the evidence favorable to such findings.

The trial court's conclusions of law as to these matters were substantially as follows : That the accounting procedures used by Mertzon Corporation were pursuant to generally accepted and sound accounting principles applicable to this type of business, and in substantial compliance with the terms of the contract. That Woodside had actual, as well as implied and apparent, authority to make the agreement on the part of Gas Enterprises, Inc., with the Mertzon Corporation pertaining to operation of the plant under such contract, including the time for furnishing monthly statements and the effective date of commencement of operation for the purpose of charging depreciation. That the obligation on the part of Gas Enterprises, Inc., to pay the net losses incurred was a material obligation under the contract and failure to perform in that respect justified the election on the part of Mertzon Corporation to terminate such contract.

The evidence shows that gas was first run into the Mertzon Plant in September, 1959, and the first few months of operation were even worse than expected from a financial standpoint. Sulphur was found to be in the gas, and it was necessary to install a gasoline sweetener to remove the sulphur. The Texas Railroad Commission reduced the production allowable, and with all of this, a "built-in" loss on the gathering and

compressing contract with K–B Compression Company. Even though under Paragraph III of the Mertzon Plant Contract, Mertzon Corporation agreed to furnish monthly statements to Gas Enterprises, Inc., the first statement covering September, October and November, 1959, was mailed to Gas Enterprises, Inc., December 31, 1959. The evidence shows it was impossible to get the statements out within 10 days after the end of each month because Mertzon Corporation had to rely upon the producers for some of the information needed, and it was not forthcoming within that time. A dispute arose between Mertzon Corporation and Gas Enterprises, Inc., over the lateness of the statements, the handling of certain items of expense, and the date for commencement of the depreciation of the facilities. Mertzon Corporation continued to send Gas Enterprises, Inc., monthly statements, even though not within the time specified in the contract. All of these statements showed losses and the amount due by Gas Enterprises, Inc., none of which were ever paid. In the late summer of 1960, as a result of negotiations between Mertzon Corporation, represented by Dow, and Gas Enterprises, Inc., represented by Woodside, it was agreed Mertzon Corporation would have six weeks to furnish the monthly statements, that accounting procedures were approved and that March 1, 1960, was the date to commence operations for the purpose of the depreciation clause. Even though these agreements were made, Gas Enterprises, Inc., did not pay the amounts shown by the statements. June 19, 1961, Mertzon Corporation, by letter signed by Dow, notified Gas Enterprises, Inc., that the Mertzon Contract had been breached and terminated by reason of the failure to pay such losses.

■ Because there is evidence to support them, we agree with the findings by the trial court that the statements furnished by Mertzon Corporation to Gas Enterprises, Inc., were in substantial compliance with the contract, and the bookkeeping procedures used were pursuant to generally ac-

cepted and sound accounting principles. We also agree that Woodside as President and General Manager had both the actual as well as implied authority to bind Gas Enterprises, Inc., with the agreements made with Mertzon Corporation.

■ Plaintiff does not deny Woodside made the agreements mentioned above, but contends he had no authority to make them. We disagree. In Section 6 of Article V of the By-Laws of Gas Enterprises, Inc., Woodside, the President, was constituted the chief executive officer of the corporation and was given the general and active management of the business of the corporation. It is well established law in the state that the general manager of a corporation does have the authority to bind that corporation by contract. Helms v. Home Owners' Loan Corporation, 129 Tex. 121, 103 S.W.2d 128 (Tex.Sup., 1937); Sealy Oil Mill & Mfg. Co. v. Bishop Mfg. Co., 235 S.W. 850, (Tex.Comm.App., 1921), 2 Hilldebrand, Texas Corporations, Section 644.

■ The failure on the part of Gas Enterprises, Inc., to pay its part of the net losses sustained was the breach of a material obligation under the contract and justified rescission and termination of the contract. Plaintiff cites First Nat. Bank v. Rush, 210 S.W. 521, (Tex.Comm.App., 1919) as authority for the proposition that where a partnership exists, the failure of one party to pay money into the partnership under a partnership agreement would not work a forfeiture of such interest and a dissolution of the partnership. We have previously held in this opinion that the contract between the parties to this suit did not create a partnership relationship, and the law expressed in this Commission of Appeals decision is not applicable.

In Cundiff v. McLean & Miller, 40 Tex. 391, 392 (1874), it is said that it is a well established rule of law that when an agreement is mutual and dependent and one party fails to perform *his* part, the other party may treat the agreement as rescinded. See Ross v. McLelland, 281 S.W.2d 773

(Tex.Civ.App.—Fort Worth, 1955, no writ); Bell v. Film Advertising Corporation, 164 S.W.2d 578 (Tex.Civ.App.—Dallas, 1942, no writ); Bank Savings Life Ins. Co. v. Steiner, 81 S.W.2d 225 (Tex. Civ.App.—Dallas, 1935, no writ); El Paso & S. W. R. Co. v. Eichel & Weikel, 130 S.W. 922 (Tex.Civ.App., 1910, error ref.); Sutton County v. Security Trust Co., 61 S.W.2d 862 (Tex.Civ.App.—Amarillo, 1933, error ref.); Casanova v. Falstaff Beer, 304 S.W.2d 207 (Tex.Civ.App.—Eastland, 1957, error ref., n. r. e.). The obligation on the part of Gas Enterprises, Inc., to pay its part of the net losses was the only material obligation under the Mertzon Plant Contract, which Gas Enterprises, Inc., had not contracted away. Mertzon Corporation could have elected to file suit upon the contract to enforce the payment of such money, but that action was not taken. The record shows that Gas Enterprises, Inc., with an original capital of $2,500.00 had only $34.00 in its only bank account on March 7, 1960. There is no evidence that this bank was increased either by income or increased capitalization. Mertzon Corporation was legally justified in rescinding the contract.

■ Plaintiff had a series of points which contend, in effect, that the trial court erred in not construing the Mertzon Plant Contract and Contemporaneous Letter Agreement to cover operations involving the gathering, compressing and processing of gas produced from the Brooks Field in Irion County. The trial court in its conclusion of law held this Contract and Letter Agreement related only to the Mertzon Field and did not extend elsewhere.

There was gas production on and after January, 1960, in the Brooks Field which was located about 11 miles from the Mertzon Field in Irion County. March 7, 1960, Woodside, as President of Gas Enterprises, Inc., made a written proposal to Mertzon Corporation for the processing of Brooks Field gas, but the terms and conditions were substantially different from those contained in the Mertzon Plant Contract.

Mertzon Corporation rejected that proposal, but offered to undertake the processing of such gas on the same basis as provided by the Mertzon Plant Contract. Woodside, as President of Gas Enterprises, Inc., rejected that offer. Thereafter, Dow, in his individual capacity, obtained gas processing contracts covering the Brooks Field. A corporation named Brooks Gas Corporation was formed by Dow and C. J. Downey, to which the Brooks Field Contracts were assigned. Then January 5, 1961, a contract between Mertzon Corporation and Brooks Gas Corporation was entered into under the terms of which Mertzon Corporation was to be paid a straight fee of $1,150.00 per month to process the gas. Brooks Gas Corporation, at its own expense, installed a gathering and compressing system and operations were commenced in January, 1961.

We find nothing ambiguous in the Mertzon Plant Contract. It is clearly stated in Paragraph VI that additional wells may be drilled and completed in the Mertzon Field, Irion County, Texas and that in the event one of the parties to the contract acquired such a processing contract, the contract would be amended to cover it. No mention is made of any processing contracts outside of the Mertzon Field in Paragraph VI or elsewhere in the contract. As heretofore mentioned, it is the Contemporaneous Letter Agreement executed on the same date as the contract that is used by plaintiff as the basis of his claim to an interest in the Brooks Field Contract. A copy of his letter contract is reproduced here so this point may be understood.

Mertzon Corporation
Houston, Texas

Re: Mertzon Field
Irion County, Texas

Gentlemen:

Contemporaneously with the execution of this letter agreement, you and the undersigned have agreed to execute that certain instrument designated "Contract"

which relates to the gathering, compressing, processing and dehydrating of the casinghead gas derived from oilwells located upon certain lands in the *Mertzon Field, Irion County,* Texas.

From time to time hereafter, additional wells may be drilled and completed in the Mertzon Field, Irion County, Texas, and the producers thereof may be desirous of entering into a processing contract or gas purchase contract with Roy Woodside, Gas Enterprises, Inc. or Mertzon Corporation; therefore, Roy Woodside, Gas Enterprises, Inc. and Mertzon Corporation mutually agree that in the event that any one of them acquires a processing contract or gas purchase contract covering real property situated in Irion County, Texas, during the term of said Contract, that he or it, as the case may be, will immediately cause the same to be treated as a part of the property covered under the terms of said Contract. Upon written request by any party hereto the other parties hereto will cause said Contract to be appropriately amended to encompass such additional property.

ATTEST:

R. W. Holman
Secretary

ACCEPTED AND AGREED:
MERTZON CORPORATION

By W. M. Dow
President

GAS ENTERPRISES, INC.

By    Roy Woodside
Roy Woodside, President
Roy Woodside

---

It is noted first that in the caption of this letter contract it is written: "Mertzon Field, Irion County, Texas." Then, in the first paragraph it mentions the "Contract" as relating to certain lands in the Mertzon Field, Irion County, Texas. Then, in the second paragraph, it is stated that additional wells may be drilled and completed in the Mertzon Field, Irion County, Texas, and the producers might be interested in contracting with Roy Woodside as well as the two parties to the contract; therefore, all three agreed that in the event any one of them acquired a gas processing or a gas purchase contract in Irion County, Texas, that it would be caused to be treated as a part of the said "Contract."

We have concluded from an examination and consideration of the entire Contract and Contemporaneous Letter Agreement that the true intention of the parties was to contract solely as to the Mertzon Field. Universal C. I. T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154 (Tex.Sup., 1951); Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504 (1942). It was the intention of the parties, in executing the Contemporaneous Letter Agreement, to add Roy Woodside individually into the contract and to cover gas purchase contracts as well as gas processing contracts. We do not construe the failure of the parties to insert the words "Mertzon Field" before "Irion County, Texas" in the last paragraph of the Contemporaneous Letter Agreement to be anything more than an oversight at most. In the face of the Mertzon Plant Contract and all of the other references in the Contemporaneous Letter Agreement, we agree with the trial court in the conclusion reached.

We have examined the remainder of plaintiff's points of error and find them to be without merit.

Affirmed.