Virginia WALKER, et al., Plaintiffs,

Lone Star Helicopters and North Central Texas Services d/b/a CareFlite, Plaintiffs – Counter–Defendants – Appellants, Cross–Appellees,

v.

MESSERSCHMITT BOLKOW BLOHM GmBH and MBB Helicopter Corp., Defendants–Counter and Third Party Plaintiffs–Appellees Cross–Appellants,

v.

The ESTATE OF Rick Lemar FEE, and The Estate of Billy Wayne Walker, Third Party Defendants–Appellants Cross–Appellees.

LONE STAR HELICOPTERS, INC., North Central Texas Services, d/b/a Careflite, The Estate of Rick Lemar Fee and The Estate of Billy Wayne Walker, Plaintiffs–Appellants,

v.

UNITED STATES FIRE INSURANCE COMPANY, Defendant–Appellee.

Nos. 86–1472, 86–1689.

United States Court of Appeals, Fifth Circuit.

May 10, 1988.
Rehearing Denied June 16, 1988.*

---

* Opinion on rehearing published at 848 F.2d 496.

238

Martha Vollers Swanger, Theodore G. Kolias, Robert A. Gwinn, Dallas, Tex., for Lone Star Helicopters, Inc., et al.

Newton J. Jones, Rebecca S. Covell, Sifford & Pezzuli, Dallas, Tex., for U.S. Fire Ins. Co.

P. Michael Jung, Kevin H. Good, John E. Phillips, Dallas, Tex., for Messerschmitt Bolkow Blohm GmBH and MBB Helicopter Corp.

Before GOLDBERG, POLITZ, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This litigation arises out of the crash of a helicopter. The primary adversaries are the owner of the aircraft and its manufacturer. Following a jury verdict, the district court entered judgment in accordance with the verdict, apportioning twenty-five percent of the damages to the helicopter owner and seventy-five percent to the manufacturer. For reasons that follow, we conclude that the judgment against the owner cannot stand; we modify the judgment to require the aircraft manufacturer to pay one hundred percent of the aircraft owner's hull loss and to exonerate the owner for the manufacturer's contribution claim for settlement sums paid survivors of the crash victims.

## I.

On April 2, 1982, a Messerschmitt helicopter model BO–105 crashed at McKinney Airport, Texas, killing its pilot, Bill Walker; co-pilot, Rick Fee; and passenger, Tom Brown. At the time of the accident, the helicopter, which was owned by North Central Texas Services (North Central), was on a training flight for Lone Star Helicopters (Lone Star) to familiarize the three Lone Star pilots with this newly retrofitted helicopter. North Central and Lone Star had a longstanding business relationship. North Central provided a helicopter ambulance service under the name CareFlight. Following the inauguration of the CareFlight system in 1979, Lone Star operated and maintained a Bell helicopter under a contract with North Central. Lone Star employees flew the specially equipped helicopter to locations designated by North Central and picked up injured or disabled individuals for emergency transport to a hospital.

Shortly before the accident, the Messerschmitt helicopter involved in this case was purchased by North Central and retrofitted to serve as an Emergency Medical Service (EMS) vehicle. As part of the sale of the helicopter, Messerschmitt Bolkow Blohm Gmbh and MBB Helicopter Corporation (MBB) provided transition training for Lone Star pilots, including a "ground school" and in-flight training. Because of thunderstorms in the Dallas area on the morning of April 2, 1982, the MBB flight instructor cancelled the in-flight training planned for that day. Later in the day, however, the weather improved and Walker, Fee, and Brown, all employees of Lone Star, decided to conduct a training flight from Love Field to McKinney Airport, also located in Dallas. During flight maneuvers at McKinney, the helicopter was observed traveling south over one of the airport runways. Suddenly, according to witnesses, the helicopter began a sharp right bank, pitched downward, and crashed.

This suit was originally brought by the survivors of Walker, Fee, and Brown as a wrongful death action against MBB, as the manufacturer of the helicopter. Lone Star

and North Central intervened to recover for the total loss of the helicopter. MBB filed a third-party complaint against the estates of Walker and Fee, alleging that pilot negligence caused the crash. MBB also counterclaimed against Lone Star and North Central, seeking indemnity or contribution on grounds that pilot negligence or the negligence of the appellants caused the accident. Before trial, MBB settled with the wrongful death claimants for $3,000,-000; MBB amended its counterclaim to seek contribution from North Central for the amount paid in settlement. On their claim for loss of the helicopter, Lone Star and North Central contended primarily that MBB had defectively designed and manufactured the helicopter's hydraulic flight control system. North Central and Lone Star specifically argued that the helicopter lost power and crashed because a defective hydraulic link in the helicopter prevented the helicopter's secondary hydraulic system from activating after the primary system failed. MBB primarily argued at trial that the crash was caused by pilot error and that this negligence by Lone Star employees should be imputed to North Central based on its joint enterprise with Lone Star.

The jury made detailed findings of fact, including the following: (1) there was a manufacturing defect in the helicopter that was a producing cause of the accident; (2) MBB was negligent in designing and manufacturing the helicopter which negligence was a proximate cause of the accident; (3) Walker was negligent in the operation of the helicopter and that negligence was a proximate cause of the accident; (4) neither North Central nor Lone Star was negligent; (5) MBB was seventy-five percent at fault in the accident and Walker was twenty-five percent at fault; (6) North Central and Lone Star were engaged in a joint enterprise at the time of the accident; (7) the market value of the helicopter was $747,500. The district court entered judgment in favor of North Central and against MBB for $560,-625, representing seventy-five percent of their property damage claim and in favor of MBB and against North Central for approximately $750,000, representing twenty-five percent of MBB's settlement with the wrongful death claimants. The court awarded six percent prejudgment interest on all awards.

The parties raise numerous issues in this appeal. North Central argues that (1) the record evidence does not support the jury's finding that it and Lone Star were engaged in a joint enterprise and therefore the district court had no basis for imputing the pilot's negligence to North Central and (2) the district court erred in allowing it to recover only six percent prejudgment interest on its award against MBB.[1] MBB cross-appeals, arguing that the jury's findings that a defect in the hydraulic system of the aircraft and improper design of that system caused the crash were unsupported by the evidence. We consider first the arguments raised by North Central.

## II.

The district court imputed the negligence of the pilot Walker to North Central on the basis of the jury's finding that North Central and Lone Star were engaged in a joint enterprise in the operation of the BO–105 helicopter. Accordingly, the court reduced North Central's property damage recovery against MBB by twenty-five percent and also entered judgment against North Central for twenty-five percent of the sum that MBB paid in settlement of the wrongful death claims. North Central contends that as a matter of law Lone Star was its independent contractor and the court should not have submitted the joint enterprise issue to the jury. Alternatively, North Central argues that the court should have instructed the jury to determine whether Lone Star was its independent contractor on the premise that such a finding precluded any joint enterprise between North Central and Lone Star. MBB argues, on the

---

1. North Central also argues the district court erred (1) in entering judgment for MBB's contribution claim against North Central; (2) in failing to apply the Texas workers' compensation bar to shield North Central; and (3) in granting U.S. Fire's motion for summary judgment. Our disposition of this case makes it unnecessary for us to reach these issues.

other hand, that the joint enterprise instruction was correct, and when the jury found a joint enterprise between Lone Star and North Central, it necessarily concluded that Lone Star was not North Central's independent contractor.

The argument of the parties requires us to examine the nature of the doctrine of joint enterprise and whether the record in this case supports the jury's finding of a joint enterprise.

Before 1974, the typical Texas joint enterprise case arose out of an automobile accident in which the court found that the driver of an automobile and his passenger were on a joint enterprise. Several of these early cases affirmed a finding of joint enterprise in conveyance cases even where the trip was for pleasure so long as it was for a common purpose and the passenger had some control over the driver. *See, e.g., Bonney v. San Antonio Transit Co.*, 160 Tex. 11, 325 S.W.2d 117 (Tex.1959) (vacation trip); *El Paso Elect. Co. v. Leeper*, 60 S.W.2d 187 (Tex.Com.App.1933) (traveling to a dance).

The Supreme Court of Texas in *Shoemaker v. Whistler*, 513 S.W.2d 10 (Tex. 1974), signalled a sharp change of direction in the Texas law of joint enterprise. In *Shoemaker*, the survivors of Wiley Shoemaker brought a wrongful death action against the Estate of Whistler, one of the co-owners of an airplane that crashed with Shoemaker on board. At the time of the crash, the aircraft was on a voluntary civil air patrol search mission. In determining whether a joint enterprise existed, the court adopted the four-element test for joint enterprise as set forth by the *Restatement (Second) of Torts:*

> The elements which are essential to a joint enterprise are commonly stated to be four: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

*Id.* at 16–17 (quoting *Restatement (Second) of Torts* § 491 comment c (1965)).

In analyzing whether Whistler and the pilot were on a joint enterprise, the court noted that "[b]y way of history, ... the law of partnership and the principles of agency serve as the foundation for the doctrine of joint enterprise." *Id.* at 16. The court then reasoned that to establish joint venture or joint enterprise a litigant must establish that the mission or enterprise has a business or commercial character consistent with its partnership roots.

The *Shoemaker* decision, tying the joint enterprise doctrine to its partnership roots, is consistent with the law in most other states. Prosser explains that

> [i]n a partnership there is a more or less permanent business arrangement, creating a mutual agency between the partners for the purpose of carrying on some general business, so that the acts of one are to be charged against another. A 'joint enterprise' is something like a partnership, for a more limited period of time, and a more limited purpose. It is an undertaking to carry out a small number of acts or objectives, which is entered into by associates under such circumstances that all have an equal voice in directing the conduct of the enterprise.

W. Prosser & E. Keeton, The Law of Torts, 516–17 (1984).

We now turn to an examination of the record evidence to determine whether the relationship between North Central and Lone Star was a joint enterprise. The facts relating to the relationship between North Central and Lone Star are largely uncontradicted. To the extent they are in dispute we accept the version favorable to the verdict. North Central was a nonprofit corporation engaged in providing ambulance service in the Dallas area. In 1979, North Central purchased a Bell helicopter to use as an air ambulance. Because North Central had no personnel trained to operate or maintain helicopters, Lone Star agreed in a written contract to provide these services. This contract governed the business relationship between North Central and Lone Star.

The Bell helicopter was stationed at Dallas' Methodist Hospital. A North Central representative typically directed the Lone Star helicopter pilot to the scene of an accident or other location where a disabled person was in need of ambulance service. Emergency medical crewmen, employed by the hospital, were on board the helicopter to administer emergency care to the victims at the scene of the accident and during the flight. The Lone Star pilot made all decisions relating to the flight of the helicopter including whether weather conditions were suitable for the flight and whether the aircraft was mechanically sound for flight. The pilot had sole control of the manner in which the helicopter was flown. Similarly, Lone Star personnel maintained the aircraft without direction from North Central. The only role North Central played in the day-to-day operation of the Bell helicopter was to direct the Lone Star pilot where to pick up an injured or disabled person. During flight, the North Central dispatcher could, if necessary, establish radio contact with the helicopter pilot and presumably could have instructed the pilot during a flight to alter his destination.

The above summary of the actual relationship of North Central and Lone Star is consistent with the written contract that governed that relationship. In Article One, Lone Star agreed to "furnish all pilots, maintenance, repairs, maintenance equipment, fuel, lubricants, parts and supplies (excluding medical supplies) required to operate the Helicopter ... and to keep the Helicopter manned and ready for service on a twenty-four (24) hour per day basis." Lone Star further agreed to "perform all maintenance and repairs ... so that, to the extent practical, the Helicopter shall be maintained in a constant state of readiness for emergency medical flight." In Article Two, North Central agreed to pay Lone Star a set monthly fee in addition to hourly maintenance and fuel charges. In Article Three, Lone Star retained full operational control and command of the helicopter and guaranteed to hold harmless North Central for any liabilities incurred by Lone Star's agents or employees. Finally, in Article Eight, the parties agreed that "[i]n the performance of this Agreement, it is agreed that the Operator is and shall at all times be an independent contractor and not an agent of [North Central]."

The written contract between North Central and Lone Star covered Lone Star's operation and maintenance of the Bell helicopter and did not relate to the BO–105 helicopter that crashed. North Central purchased the BO–105 helicopter from MBB in November 1981 and outfitted it as an air ambulance. The helicopter was scheduled to go into service as an ambulance on the Monday following the Friday, April 2, 1982 crash.

Because the BO–105 helicopter had not yet been placed in service, North Central and Lone Star had not executed a written contract for the operation and maintenance of that aircraft. The evidence is uncontradicted, however, that the parties had agreed that Lone Star would operate and maintain this new helicopter under the same terms and conditions as provided in the existing contract for the operation of the Bell helicopter. Thus the terms of the written contract governing Lone Star's maintenance and operation of the Bell helicopter is central to our consideration of the relationship between Lone Star and North Central at the time of the accident.

With this discussion of the record evidence bearing on the relationship of Lone Star and North Central, we turn to the legal questions presented.

■ North Central urged the district court to instruct the jury that a finding that Lone Star and North Central were engaged in a principal/independent contractor relationship precluded the possibility of a joint enterprise between the two parties. We are persuaded that North Central's argument is sound. Courts have consistently considered partnerships and joint ventures as fundamentally different from a principal/independent contractor relationship. The reasons are obvious. A partnership contemplates a sharing of profits and losses among the partners as well as a sharing of control. An independent con-

tractor, on the other hand, is typically paid a fixed sum for performing a given task and does not share in profits or losses. Also, unlike a partner, the principal does not retain the right to control the details of the work the independent contractor has agreed to perform. The Tenth Circuit contrasted the relationships of principal/independent contractor and joint venturers:

> [A]n independent contractor is one who, exercising an independent employment, contracts to do work according to his own methods and without being subject to the control of his employer except as to the result of the work. A joint venture is a special combination of two or more persons where, in some specific venture, a profit is jointly sought without any actual partnership or corporate designation.

*Albina Engine and Mach. Works, Inc. v. Abel*, 305 F.2d 77, 81 (10th Cir.1962) (citations omitted). At least two Texas courts have distinguished the relationships of joint venture and principal/independent contractor in a similar manner. *See Jeffcoat v. Phillips*, 534 S.W.2d 168, 173 (Tex.Civ.App. —Houston 1976, *writ ref'd n.r.e.*); *Holman v. Dow*, 467 S.W.2d 547, 550–51 (Tex. Civ.App.—Beaumont 1971, *writ ref'd n.r. e.*); *Price v. Wrather*, 443 S.W.2d 348, 352– 53 (Tex.Civ.App.—Dallas 1969, *writ ref'd n.r.e.*). While these cases deal with the distinction between principal/independent contractors and joint venturers, we are persuaded that the same reasoning applies to the closely related doctrine of joint enterprise. Both spring from partnership roots and we must look to the nature of the underlying doctrine of partnership to define the fundamental characteristics of both doctrines.

In addition to the legal precedent discussed above, sound policy reasons require that we maintain a clear distinction between partnerships, joint ventures, and joint enterprises on the one hand and principal/independent contractors on the other. If we accept MBB's argument and define joint enterprise and joint venture so broadly as to include principal/independent contractor relationships, we would reorder many of the business relationships in Tex-

as. If two businessmen decide to structure their relationship as that of principal/independent contractor and follow settled rules for doing so, they should not have courts take the drastic step of converting that relationship to a joint enterprise, a species of partnership. We reject the notion that a principal cannot delegate part of its work to a contractor and shift the liability and responsibility for performance of that work to the contractor.

Because of the fundamental distinction between the two relationships as described above, we agree with Lone Star and North Central that if Lone Star were North Central's independent contractor at the time of the accident, the jury was precluded from finding that the two entities were engaged in a joint enterprise.

▮ We now turn to a consideration of whether we must remand this case for a partial new trial and permit the jury to consider whether Lone Star and North Central were in a principal/independent contractor relationship. After a careful review of the record, we are persuaded that such a remand is unnecessary because we conclude that these parties were in a principal/independent contractor relationship as a matter of law.

An "independent contractor" has been defined by Texas courts as "any person who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all of its details." *Pitchfork Land & Cattle Co. v. King*, 162 Tex. 331, 346 S.W.2d 598, 602–03 (1961). In *Home Interiors & Gifts, Inc. v. Veliz*, 695 S.W.2d 35, 41 (Tex.Civ. App.—Corpus Christi 1985) (citing *Pitchfork Land & Cattle Co.*), the Texas Court of Appeals isolated five characteristics of an independent contractor that can serve as the test for determining whether an entity is an independent contractor: "(1) the independent nature of his business; (2) his obligation to furnish necessary tools, supplies and materials to perform the job; (3) his right to control the progress of the work

except as to the final results; (4) the time for which he is employed; and (5) the method of payment, whether by the time or by the job." Each of these elements will be considered separately as they relate to the North Central/Lone Star relationship.

The first element of the above test is the independent nature of the entity's business. Lone Star operated and maintained helicopters for a number of different clients, including North Central. Lone Star's customers, including North Central, paid Lone Star a set monthly fee plus collateral costs. Lone Star operated its business independent of its customers, including North Central.

The second element is the "obligation to furnish necessary tools, supplies and materials to perform [a] job." *Home Interiors & Gifts, Inc.*, 695 S.W.2d at 41. In its contract with North Central, Lone Star agreed to "furnish all pilots, maintenance, repairs, maintenance equipment, fuel, lubricants, parts and supplies (excluding medical supplies) required to operate the Helicopter ... and to keep the Helicopter manned and ready for service on a twenty-four (24) hour per day basis." Lone Star furnished the necessary tools and supplies to operate and maintain the helicopter.

The third element of the test is "[a] right to control the progress of the work except as to the final results." *Id.* Lone Star had total control of the details of operating and maintaining the helicopter. Although North Central routinely directed the helicopter to its destination, North Central had no significant role in the details of the maintenance or operation of the helicopter.

The fourth element of the independent contractor test is "the time for which [an individual] is employed." *Id.* Lone Star's arrangement with North Central was a fixed term contract at the end of which either party could terminate the relationship.

The final element of the independent contractor test is "the method of payment." *Id.* North Central agreed to pay Lone Star a lump sum per month, plus collateral variable costs. Significantly, Lone Star's payments were not dependent on the success of North Central's business.

Applying Texas law on the requisites of a principal/independent contractor relationship, the uncontradicted evidence leaves nothing for the jury to decide: Lone Star was North Central's independent contractor as a matter of law. Because the principal/independent contractor relationship is fundamentally incompatible with a joint enterprise, the jury's finding of joint enterprise cannot stand. The district court erred in refusing to grant North Central's motion for judgment NOV on this jury finding.

### III.

■ North Central and Lone Star also contest the trial court's allowance of only six percent rather than ten percent prejudgment interest on its recovery for the total loss of the helicopter.

MBB acknowledges that the Texas Supreme Court in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985), held that equitable principles governing prejudgment interest applied to that case and required a prejudgment interest award of ten to fifteen percent under article 5069–1.03.[2] MBB contends, however, that *Cavnar* only applies to death and personal injury cases.

We rejected this argument in *Wood v. Armco, Inc.*, 814 F.2d 211 (5th Cir.1987). In *Wood* the plaintiff recovered in tort for fraudulent misrepresentation. We held that the district court correctly awarded interest at the ten percent rate under the equitable principles articulated by *Cavnar* rather than six percent as authorized by article 5069–1.03. We expressly rejected the appellant's argument that the statutory

---

**2.** Art. 5069–1.03 provides:
When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum

payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.
Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (Vernon Supp.1987).

rate of six percent was the appropriate rate in a non-personal-injury tort case.

We reject that same argument here. Our holding in *Wood* is consistent with a recent Texas Supreme Court ruling on prejudgment interest. *Perry Roofing Co. v. Olcott,* 744 S.W.2d 929 (Tex.1988). The judgment in favor of Lone Star and North Central will be modified to provide for prejudgment interest at the rate of ten percent rather than at the six percent rate awarded by the trial court.

### IV.

In its cross-appeal Messerschmitt raises a number of issues. Only one of these arguments, however, must be considered in light of our holding on the joint enterprise issue.

MBB argues that the evidence did not support the jury's findings that the improper design of the hydraulic system was causally related to the crash. A brief factual discussion is necessary to understand this argument.

The BO–105 helicopter has a primary and a secondary hydraulic system which are critical to the operation and handling of the aircraft. If the primary hydraulic system fails in flight, the secondary hydraulic system should be automatically activated in what is referred to as a "hydraulic system switchover." This switchover should occur when the primary system loses more than fifty percent of its internal pressure, which sometimes happens with sudden steering shifts. North Central and Lone Star argued that a switchover occurred during the final turn of the helicopter over McKinney Field but that a defective hydraulic link kept the secondary system from activating. According to this theory, the result was a "collective bottoming episode," or a loss of power and all ability to gain altitude. It was this defective link—which MBB admits the evidence established was too short for specifications—that was the linchpin in North Central's theory of causation.

In considering MBB's challenge to the sufficiency of the evidence to support the jury's causation finding we follow the familiar *Boeing* standard: whether, viewing the evidence favorable to North Central, a

reasonable jury could have rationally reached this verdict. *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc).

North Central and Lone Star introduced considerable evidence supporting their theory that the helicopter lost power and crashed in a collective bottoming episode. Dr. George Edward Clarke, a mechanical engineer, testified regarding his examination and evaluation of the link which is an essential part of the mechanism designed to switch the helicopter's hydraulic system from the primary to the secondary component. Dr. Clarke testified that the link in question was too short and unable to perform its function according to design specifications. Dr. Clarke also testified that his own testing, and the testing of other experts, led him to conclude that this BO–105 experienced "switchover shock" during takeoff and climb and that the malfunction resulted in the sudden loss of power.

Terry Haslip, a metallurgical and aeronautical engineer, also testified concerning tests that he performed in the cockpit of the helicopter. His tests revealed that cockpit warning lights were on at the time of the impact which indicated to him that a malfunction of the primary hydraulic system had occurred.

MBB argues that this, and other evidence, was inadequate to support the jury's findings. MBB notes that the National Transportation Safety Board investigator found no evidence of a hydraulic system switchover problem. Moreover, MBB argues that there was no evidence of a "left jaw" movement, or other jerky or unusual movements before the crash, which would be expected if a switchover problem occurred. Finally, MBB argues that even if a defective hydraulic link caused a switchover problem, there was no evidence to indicate that this actually caused a collective bottoming episode. On this latter point, MBB points to evidence that a hydraulic pressure loss in such a situation is usually momentary, permitting the pilot to recover control of the aircraft before impact.

North Central's evidence was adequate to support the jury findings. The jury was not obliged to accept the findings of the

National Transportation Safety Board. Moreover, the jury was entitled to conclude that a hydraulic loss of short duration can have drastic consequences when the aircraft is flying at low altitude where the time to recover is short.[3]

## CONCLUSION

We conclude that Lone Star was North Central's independent contractor as a matter of law and that the jury finding that these two entities were engaged in a joint enterprise must be set aside. As a result, Walker's negligence cannot be imputed to North Central. We also conclude that the court erred in awarding only six percent prejudgment interest instead of the ten percent rate requested by North Central. In all other respects, the district court's judgment is affirmed.

Accordingly, we vacate the judgment and remand this case to the district court for entry of judgment consistent with this opinion.

AFFIRMED in part, VACATED in part, and REMANDED.

3. MBB also argues that the district court erred when it admitted evidence of other "collective bottoming" incidents involving other BO–105 helicopters. At trial, Wayne McKinney, a helicopter pilot testified without objection regarding an incident in a BO–105 where he experienced a collective bottoming problem. McKin-ney testified that a service technician from Messerschmitt attributed this incident to a connecting link that was too short in the helicopter. Because MBB did not object to this evidence, it did not preserve this alleged error for appeal. *Collins v. Wayne Corp.*, 621 F.2d 777, 783 (5th Cir.1980).